# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2017-KA-00719-SCT

*ROGER LEE JACKSON a/k/a ROGER JACKSON*
*a/k/a ROGER L. JACKSON*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 05/05/2017 |
| TRIAL JUDGE: | HON. JEFF WEILL, SR. |
| TRIAL COURT ATTORNEYS: | GREG RICHARD SPORE |
| | MICHELE PURVIS HARRIS |
| | MICHAEL ERIC BROWN |
| | ESEOSA GWENDLINE AGHO |
| | JACK BRADLEY McCULLOUCH |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF THE STATE PUBLIC DEFENDER |
| | BY: GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: ALICIA MARIE AINSWORTH |
| DISTRICT ATTORNEY: | ROBERT SHULER SMITH |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 06/14/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE KITCHENS, P.J., BEAM AND CHAMBERLIN, JJ.**

**BEAM, JUSTICE, FOR THE COURT:**

¶1.    Roger Lee Jackson appeals from his convictions for aggravated assault and felon in possession of a firearm after a jury trial in Hinds County Circuit Court.  The jury acquitted Jackson of deliberate-design murder, which was charged in the same indictment.  Jackson

claims the trial court committed reversible error by: (1) limiting defense counsel's cross-examination of State's witnesses; and (2) limiting defense counsel's closing argument about reasonable doubt. Finding no reversible error, we affirm Jackson's convictions.

**FACTS**

¶2. In the early morning hours on November 11, 2014, two men were shot near Roach Street in Jackson, Mississippi. One of the victims, Quincy McGowan, died. His body was discovered in a nearby vacant lot by a passerby shortly after noon on November 11. Police found ten 9 mm shell casings near the body, and a 9 mm projectile was recovered from McGowan's body during autopsy.

¶3. The other victim, Emmanuel Jones, survived after being shot five times–once in the face, three times in the torso, and once in the foot. Doctors retrieved a .22 caliber projectile from Jones's body during treatment at a nearby hospital.

¶4. Jones testified at Jackson's trial. According to Jones, he and Jackson were riding around in Jackson's vehicle looking to buy some drugs on the night of the shooting. At some point, Jones and Jackson encountered Jerry Lewis driving another vehicle, with two males riding as passengers. Jones and Jackson followed Lewis to the vicinity of Roach Street and Farrish Street, where they parked the vehicles in a vacant lot.

¶5. Jackson and Lewis got out of their vehicles and started talking. The two then began to argue. Jones said he heard Jackson tell one of the other individuals riding with Lewis to get out of the vehicle. Jones said he heard a gunshot, and he saw Jackson shoot McGowan.

2

Jackson then came back to his vehicle and walked over to the passenger side where Jones was sitting, and began shooting Jones.

¶6.     Jones got out of the vehicle and ran to a nearby house, banged on the door, and collapsed on the porch. The home's occupant called 911.

¶7.     A couple of weeks after the shooting, Jones identified Jackson from a photo lineup as the person who had shot him. Jones told the jury he believed Jackson had shot him (Jones) because Jackson did not want any witnesses.

¶8.     On cross-examination, Jones admitted he was a prior-convicted felon and was on probation at the time of the shooting. Jones said he was not allowed to own or possess a firearm. Jones said he did not own a gun, and was not in possession of one at the time of the shootings.

¶9.     Jones's sister, Jerminda Myers, testified on behalf of the State. Myers said, soon after the shooting, she talked to Jones at the hospital about what had happened. Myers, who had once dated Jackson, said she had received a phone call from Jackson shortly after she talked to Jones at the hospital. Jackson said he heard Jones had been shot. According to Myers, Jackson was questioning her about Jones's condition and trying to find out if Jones was able to talk. Myers said she "played along" and told Jackson Jones "was in critical condition." Myers said "it wasn't true." Jones was not in critical condition, and she had talked to Jones and Jones had told her who shot him. Myers said when Jackson said to her, "Ain't no telling who did it[,]" she "almost bit [her tongue] off."

¶10. Myers said she received another phone call from Jackson a day later, asking if she still lived in the same apartment. And Jackson asked if Myers's mother still lived in the same location. Myers said she responded to Jackson: "I asked him did his mom stay in the same spot she lived in."

¶11. Detective Rozerrio Camel of the Jackson Police Department testified on behalf of the State and the defense. Detective Camel investigated the scene where McGowan's body was found on November 11.

¶12. Detective Camel said Jackson developed as a suspect in the case during his investigation. And Detective Camel said he received a telephone call from an individual named Michael Davis, saying he had some information concerning the death of McGowan.

¶13. Davis testified at trial that McGowan was his best friend, whom he had known since the fourth grade. When Davis learned McGowan had been killed, Davis began asking around trying to found out who had killed him. Davis said when he spoke to Jackson, Jackson had admitted killing McGowan. According to Davis, Jackson stated: "Okay. I did it. Now what are you going to do?"

¶14. Davis thereafter spoke to Detective Camel and told him that Jackson had said he had killed McGowan. Detective Camel showed Davis a photograph lineup, from which Davis identified Jackson. Davis also identified Jackson in the courtroom as the person who had told him that he had killed McGowan.

¶15. On cross-examination, Davis testified that he had a subsequent conversation with Jackson in which Jackson said that Lewis also was involved, along with someone named "Tope."

¶16. During the defense's case-in-chief, the defense called two witnesses: Detective Camel and Tommy Bishop, a firearms examiner at the Mississippi Crime Laboratory. Jackson did not testify.

¶17. The defense first asked Detective Camel about items that were found at the crime scene and what, if any, forensic tests were conducted on those items. Detective Camel said he had turned over all the items recovered to the Mississippi Crime Lab. The defense also asked Detective Camel whether any DNA samples were collected from Jones, or from anyone else in connection with the shootings. Detective Camel said no DNA samples were collected from anyone.

¶18. Lastly, the defense asked Detective Camel whether he had interviewed Lewis during the course of his investigation. Detective Camel said he had interviewed Lewis, and Lewis was considered a potential suspect. But according to Detective Camel, they did not have enough evidence linking him to the shooting(s). Detective Camel said "nobody came to me and told me that they saw [Lewis] shoot [anyone]." When the defense asked Detective Camel whether Lewis was dismissed as a potential suspect, Detective Camel said: "I never did dismiss him. I just didn't have enough to make an arrest. Like I said, I did interview him."

¶19. Bishop testified that he had examined one of the bullet projectiles recovered from Jones's body. Bishop said he was positive it was "a .22-caliber[,]" and not a "nine-millimeter." Based on a question asked by the defense, Bishop said the report he received in the case listed two suspects, "Roger Jackson and Jerry Lewis."

¶20. After the case was submitted to the jury, Jackson was found guilty of aggravated assault and felon in possession of a firearm. The jury acquitted Jackson of deliberate-design murder. This appeal followed. Additional facts will be related in the discussion of the issues.

## DISCUSSION

### I. Whether the trial court erred in limiting Jackson's cross-examination of the State's witnesses.

¶21. Jackson claims his defense strategy at trial was to impeach Jones and shift the blame for both shootings to Lewis. According to Jackson, at several key points during cross-examination of state witnesses, the State interrupted Jackson's efforts to establish evidence in support of his defense with various objections that were sustained by the trial court. Jackson contends this violated his federal and state constitutional rights to confront witnesses against him. *See* U.S. Const. amends. V, VI; Miss. Const. art. 3, § 26 (1890).

¶22. First, according to Jackson, after Jones testified that Lewis and Jackson were arguing, defense counsel asked Jones if he had reported to the police that during the argument, Lewis had expressed angry remarks about Lewis's residence being "shot up." The State objected on the basis that the question was "improper," and the trial court sustained without stating the basis, telling the jury to disregard the question and the answer elicited.

6

¶23. Jackson contends that, since the fact Jackson and Lewis had been arguing had been established, the subject of the argument was relevant and probative under Mississippi Rules of Evidence 401, 403, and 613. Jackson argues that the question did not call for a hearsay response, because what was asked was not to establish the truth of the matter asserted, but rather to establish that Lewis was angry. *See* M.R.E. 801(c). And Jackson submits that, even if it was hearsay, two exceptions to the rule applied, those for excited utterances and a present-sense impression, under Rules 803(1) and (2), because Lewis was involved in an argument.

¶24. Jackson next argues that, during Detective Camel's cross-examination, defense counsel was in the process of laying a foundation that something Jones purportedly said to the police gave indication that Lewis may have shot Jones and McGowan. The State objected and the trial court sustained, finding the question called for speculation.

¶25. According to Jackson, since it was known two different calibers of ammunition were used in the shootings, it was reasonable to conclude there may have been two shooters. Therefore, the jury was entitled to know what Jones said, if anything, about Lewis firing any weapons.

¶26. Lastly, on this issue, Jackson claims that another damaging limitation of his right to confrontation occurred when defense counsel "began to press" Davis on exactly what Jackson had said to him about Lewis's involvement. The State objected to hearsay, and the trial court sustained, finding that testimony about what Jackson had told Davis about Lewis's involvement was inadmissible, self-serving hearsay.

¶27.    Jackson argues that, since he (Jackson) allegedly admitted to Davis that he had shot McGowan, his (Jackson's) alleged remarks about Lewis's involvement were not self-serving and were admissible.  Jackson contends the entire conversation between Davis and himself was admissible under a defendant's right to have his entire statement considered when offered by the State, including any self-serving portions.  Jackson relies on *Sanders v. State*, 237 Miss. 772, 115 So. 2d 145, 146-47 (1959), in which this Court held that, in regard to confessions: "[T]he whole of what the accused said on the subject at the time of making the confession should be taken together.  The prosecution is entitled to show the whole statement, or if any part is omitted, the accused is entitled to supply it."  Further, "the accused is entitled to have the entire conversation including any exculpatory or self-serving declarations connected therewith, also admitted."  *Id*. at 147.

¶28.    Jackson maintains that Mississippi long has followed the wide-open cross-examination codified in Rule of Evidence 611(b). And the trial court violated this rule by limiting Jackson's cross-examination, which irreparably prejudiced Jackson's attempt to present a defense and violated his constitutional right to confront key witnesses.

¶29.    Jackson claims he also was prejudiced by not being allowed to present evidence in support of his defense, namely, that Lewis shot McGowan and Jones.  Citing *Terry v. State*, 718 So. 2d 1115 (Miss. 1998), and *Keys v. State*, 635 So. 2d 845 (Miss. 1994), Jackson points out that this Court steadfastly has held that a "criminal defendant is entitled to present his defense to the finder of fact, and it is fundamentally unfair to deny the jury the

8

opportunity to consider the defendant's defense where there is testimony to support the theory." **Terry**, 718 So. 2d at 1121.

¶30. Jackson urges application of the principles that guided this Court in **Terry**, in which the defendant was charged with embezzling money from her employer. **Id**. at 1120-21. In **Terry**, the defendant sought to present evidence that other people, including the business owners, were possible suspects, but the trial court prevented her from doing so. Reversing the trial court judgment, this Court held that "when an accused is being tried for a serious offense, the jury is entitled to hear any testimony that the [defendant] may have in the way of an alibi or defense." **Id**. at 1123.

¶31. Here, we find no reversible error in any of Jackson's claims. We will discuss each separately.

¶32. Our standard of review regarding the admission or exclusion of evidence is abuse of discretion. **Brown v. State**, 965 So. 2d 1023, 1026 (Miss. 2007). "For a case to be reversed on the admission or exclusion of evidence, it must result in prejudice and harm or adversely affect a substantial right of a party." **Pham v. State**, 716 So. 2d 1100, 1102 (Miss. 1998).

**Jones**

¶33. The defense sought to impeach Jones with prior, inconsistent, out-of-court statements that the defense contends Jones made to Detective Camel during his investigation in the case. The defense also sought to obtain evidence from Jones in support of its theory in the case that Lewis, not Jackson, may have been the shooter of both victims.

9

¶34. According to the record, after defense counsel asked Jones about his trial testimony regarding the three men in the other vehicle, and about Jones being able to identify only Lewis from the other vehicle, the following exchange took place.

> Q. Thank you. Now, [Jackson] and Jerry Lewis, "Puppy," were arguing over something for about ten or 15 minutes, right?
>
> A. Yes, sir.
>
> Q. They were arguing for about ten or 15 minutes?
>
> A. Yes.
>
> Q. Okay. And at some point during this five, ten-minute argument, conversation, Mr. Lewis said, "that m*****f***** had something to do with this," Mr. Lewis's, "residence being shot up," correct?
>
> A. Yes, sir.
>
> Q. Okay.

¶35. At that point, the State interrupted and asked to approach the bench. During the bench conference, the State claimed this line of questioning was improper on the ground it constituted hearsay. The trial court asked the defense for a response, to which defense counsel said there was no contemporaneous objection by the State. The trial court responded: "Well, the objection has been made. And do you have a response to it?" The defense replied, "No." The trial court then sustained the State's objection and told the jury to disregard the witness's last comment.

¶36. We find no error in the trial court's ruling. Jackson is correct that a defendant in a criminal trial has a fundamental right, implicit in the Confrontation Clauses of our federal and state constitutions, to cross-examine the witnesses testifying against the defendant. U.S.

10

Const. amends. V, VI; Miss. Const. art. 3, § 26 (1890). The right, however, is not unbounded. *Foster v. State*, 508 So. 2d 1111, 1114 (Miss. 1987), *overruled on other grounds by Powell v. State*, 806 So. 2d 1069 (Miss. 2001). "Its contours are shaped so as to accom[m]odate other legitimate interests[]; and it is always subject to the trial court's inherent power to limit cross-examination to relevant factual issues." *Id*. (citing *Chambers v. Mississippi*, 410 U.S. 284, 93 S. Ct. 1083, 35 L. Ed. 2d 297 (1973), and *Johnston v. State*, 376 So. 2d 1343 (Miss. 1979)); *see also Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986) ("[T]he Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.").

¶37. Ultimately, determining whether the trial court abused its discretion in limiting cross-examination necessitates "careful reflection upon the nature and purpose of the question propounded." *Black v. State*, 506 So. 2d 264, 267 (Miss. 1987). And this Court has held that "[o]ne is deprived of the right to cross-examine when the trial court fundamentally and substantially restricts it[,]" and the court does so through no fault of the cross-examiner. *Culp v. State*, 933 So. 2d 264, 276 (Miss. 2005) (citing *Myers v. State*, 296 So. 2d 695, 701 (Miss. 1974)).

¶38. Here, the trial court invited defense counsel to respond to the State's objection that Lewis's alleged statement prior to the shootings about Lewis's "residence being shot up" constituted hearsay. But defense counsel had no response. Accordingly, the defense failed to preserve error, if any, on the trial court's ruling.

11

¶39.   This Court repeatedly has held that the trial court cannot be put in error for something upon which it had no opportunity to pass. *Patterson v. State*, 594 So. 2d 606, 609 (Miss. 1992).  Now on appeal, Jackson argues for the first time that the question did not call for a hearsay response because what was asked was not to establish the truth of the matter of asserted, but rather to establish that Lewis was angry.  This argument, however, was never presented to the trial court and thus is barred from consideration on appeal.  *Id*. at 609.

**Detective Camel**

¶40.   The record shows the following exchanges occurred during the defense's cross-examination of Detective Camel:

> Q.   All right. Now, you further learned that [Jones] believes [Jackson] shot [him, Jones], correct?
>
> A.   I can't answer that.  I can basically answer what he told me.  When I talked to [Jones], [Jones] told me that [Jackson] was the person that shot him.
>
> Q.   Okay.
>
> A.   [Jones] didn't say he believed. [Jones] said [Jackson] was the person that shot him.
>
> Q.   Okay.  But you then learned that [Jones] might have been shot unintentionally, correct?
>
> A.   I can't answer that.  I wasn't there when that was stated.

¶41.   At this point, the State objected and a bench conference ensued.  The State contended the defense was attempting to mislead the jury.  The trial court then asked defense counsel, "what's your good faith basis for that?"  Defense counsel replied, "Everything I've said comes from the police reports."  The trial court said, "Well, if the question is he might have

12

been shot accidentally, doesn't that call for speculation?" Defense counsel replied that he was simply asking Detective Camel "what he learned as the investigation proceeded[,]" and "was not asking him to state it as a matter of truth." Defense counsel argued that Mississippi caselaw says that "out-of-court statements to the police as they relate to what the police did in their police investigation are not hearsay." The trial court responded: "Oh. So the statement that you were attempting to suppress a few moments ago of this witness would – fit that very category, then, right?" Defense counsel replied: "No, sir, it doesn't, because there's a Confrontation clause issue with respect to Michael Davis." The trial court then sustained the State's objection, stating: "I'm going to sustain the objection. I think we're getting pretty far afield. So please continue."

¶42. Defense counsel proceeded:

> Q. Now, you learned during the course of your investigation that Jerry Lewis, "Puppy," was possibly involved in the shooting of [Jones], correct?
>
> A. I learned that he was there.
>
> . . .
>
> Q. And you further learned that Puppy . . . might have shot [Jones,] correct?

¶43. The State objected and another bench conference ensued. The State objected to any mention that "Puppy" was the shooter or possible shooter in this investigation. Defense counsel responded: "I'm taking it all from the police reports, Your Honor, the discovery provided to me and narratives and all the incident reports. I'm taking this right from that, and I'm just building through the investigation. That's all I'm doing." The trial court responded:

All right. The police reports of a murder investigation contain all kinds of information, which may or may not be relevant, provable or salient ultimately. And the information you're offering may be admissible through another source, but it's not admissible through this witness just to go into his investigation and talk about possibilities where there's no supporting evidence that's been . . . produced.

Feel free to do that in your case in chief, but not through various rabbit trails . . . that the police may have had to go on in the investigation. So I'm going to sustain the objection.

¶44. Jackson, as mentioned, argues on appeal that, since it was known that two different sizes of ammunition were used in the shootings of McGowan and Jones, it was reasonable to conclude that there might have been two shooters. And the jury was entitled to know "what Jones said, if anything, about Lewis firing any weapons."

¶45. But as the State points out, Jackson failed to make a proffer of Detective Camel's testimony about whether he learned Lewis might have shot Jones. "When testimony is not allowed at trial, a record of the proffered testimony must be made in order to preserve the point for appeal." *Green v. State*, 89 So. 3d 543, 554 (Miss. 2012); *see also Davis v. State*, 130 So. 3d 1141, 1150 (Miss. Ct. App. 2013) (refusing to find that trial court abused its discretion in sustaining prosecution's hearsay objection during defense's cross-examination of State's witness when no proffer was offered by the defense and the substance of the evidence sought was not clear from the question(s)).

¶46. Jackson is correct that this Court has held that out-of-court statements, otherwise inadmissible at trial as hearsay, are "admissible to the extent required to show why an officer acted as he did and was at a particular place at a particular time." *See Swindle v. State*, 502 So. 2d 652, 658 (Miss. 1987) ("It is elemental that a police officer may show that he has

14

received a complaint, and what he did about the complaint without going into the details of it.").

¶47. But counsel, whether for the State or the defense, "must have a good faith basis for any question asked on cross-examination[.]" *Flowers v. State*, 773 So. 2d 309, 327 (Miss. 2000); *Foster*, 508 So. 2d at 1115, *overruled on other grounds by Powell,* 806 So. 2d 1069 (citing *U.S. v. Peterson*, 808 F. 2d 969, 977-78 (2d Cir. 1987)). Absent a good-faith basis, it is improper for the cross-examiner to assert in the form of a question the truth of a factual statement included within the question. "For example, counsel should not ask an eyewitness, 'Isn't it true that you are legally blind?' unless counsel has a good-faith basis for asking the question." *Foster*, 508 So. 2d at 1115.

¶48. As the State points out, no proffer was made by the defense as to the police reports or as to Detective Camel's testimony with regard to the police reports. The complained-of questions asked by the defense during cross-examination of Detective Camel clearly assert factual statements as true, but without a showing to the trial court and the record as to whether a good-faith basis exists for the assertion. Consistent with *Green*, the claimed error is waived.

¶49. Further, as the above-mentioned facts illustrate, the defense called Detective Camel as a witness during its case-in-chief, and no attempt was made to produce from Detective Camel any similar evidence the defense had attempted to produce during its cross-examination of the detective.

¶50. Accordingly, we find no merit in this point of error.

15

**Davis**

¶51. During cross-examination of Davis, defense counsel sought to admit an audio CD of Davis's interview with police for the purpose of impeaching Davis's testimony about the second conversation Davis had Jackson. The State objected, arguing that Jackson's statements to Davis inculpating other people for McGowan's murder were self-serving. The State also argued that using the audio to impeach parts of Davis's testimony was not proper because it constituted self-serving hearsay from Jackson. The trial court sustained the State's objection, agreeing with the State that the second conversation contained self-serving hearsay from Jackson.

¶52. Again, hearsay is an out-of-court statement that "a party offers in evidence to prove the truth of the matter asserted in the statement." M.R.E. 801. An out-of-court statement made by a party and offered against that party is not hearsay. M.R.E. 801(d)(2)(A). Thus, statements made by a defendant to a witness are admissible when offered by the State against the criminal defendant, because they are not hearsay. *Id*. If a defendant wishes to introduce any of his or her own out-of-court statements, however, he or she must prove the evidence is either not hearsay or is otherwise admissible. *See* M.R.E. 802.

¶53. A "prior statement by a witness" offered to show inconsistency with testimony at trial also is not hearsay. M.R.E. 801(d)(1). This rule, however, applies only to prior inconsistent statements of testifying witnesses. "Whereas an inconsistent statement by a testifying witness can be used to impeach that witness's credibility, an inconsistent account by another source is offered to show an alternative view of the truth." *U.S. v. Bao*, 189 F.3d 860, 866 (9th Cir. 1999) (quoting *Bemis v. Edwards*, 45 F.3d 1369, 1372 (9th Cir. 1995)). "Only the

16

declarant of the prior inconsistent statement, and not another witness, may be impeached with the statement." *Id*.

¶54. Here, the defense told the trial court it wanted to introduce the audio recording of Davis's interview with the police for the purpose of impeaching Davis's testimony, "nothing more." Defense counsel stated: "Your Honor, there were several questions that I asked concerning details, and [Davis] simply – he either contradicted them as never happening or he said he does not remember. So we would like . . . to offer this . . . audio recording as impeachment."

¶55. The trial court responded: "And these are details that he learned from your client?" To which defense counsel replied, "Exactly right. And he says as much."

¶56. Defense counsel also told the trial court that the audio recording of Davis's police interview was approximately "34 minutes" long. And redactions needed to be made to it.

¶57. For the first time on appeal, Jackson now argues the audio recording was admissible under a defendant's right to have his entire statement considered when parts of that statement are offered by the State, including any self-serving portions. Jackson relies on *Sanders*, in which this Court explained:

> In the proof of confessions, the whole of what the accused said on the subject at the time of making the confession should be taken together. The prosecution is entitled to show the whole statement, or if any part is omitted, the accused is entitled to supply it. It is also well settled that if a confession is made under such circumstances as to authorize its admission into evidence, the accused is entitled to have the entire conversation, including any exculpatory or self-serving declaration connected therewith, also admitted.

*Sanders*, 237 Miss. 772, 115 So. 2d at 146-47.

17

¶58. This rule now is subsumed by Mississippi Rule of Evidence 106. Often referred to as the rule of completeness, it provides that, when a party introduces all or part of a writing, recorded statement, or audio recording, "the adverse party may require introduction, at that time, of any other part–or any other writing or recorded statement–that in fairness ought to be considered at the same time." *See* M.R.E. 106. "Under Mississippi case law the rule of completeness is extended . . . even to oral statements." M.R.E. 106 cmt. (citing ***Sanders***, 237 Miss. 772, 115 So. 2d 145).

¶59. Here, Jackson failed to invoke this rule or make any argument for it to the trial court. That should have been done, along with requesting a proffer of the audio recording on that basis. Because that was not done, this Court has no way of knowing what is contained in the audio recording. And the matter cannot be considered on direct appeal. ***Green***, 89 So. 3d at 554.

¶60. Further, given defense counsel's contention that portions of the audio recording would have to be redacted, it is presumable that defense counsel did not want to proceed under this rule. Otherwise, the door would have been opened for the State to have the audio recording played in its entirety, unredacted. *See* M.R.E. 106.

¶61. We find no reversible error in the trial court's ruling, and this point of error is without merit.

> **II. Whether the trial court erred in limiting defense counsel's closing argument about reasonable doubt.**

¶62.   During closing arguments, defense counsel began to address the jury about the State's burden to prove its case beyond a reasonable doubt.  The State objected, claiming the defense was attempting to define reasonable doubt.  The trial court overruled the objection.

¶63.   Defense counsel proceeded, stating:

> You can think of reasonable doubt relative to other degrees of certainty.  Now, by example, in a criminal case, you may think the accused probably committed the crime.  That's not enough.  You may believe the accused likely committed the crime.  That too is not enough.

The State again objected at that point, and the trial court sustained the objection.

¶64.   Jackson contends this was error.  Jackson submits that, although the trial court is not allowed to define reasonable doubt for a jury, it has never been the case that counsel is forbidden from arguing what reasonable doubt is or comparing the burden to other standards during closing arguments.

¶65.   This Court has held that "a definition of reasonable doubt is not a proper instruction for the jury[,]" because "reasonable doubt defines itself and needs no further definition by the court." *Martin v. State*, 854 So. 2d 1004, 1009 (Miss. 2003); *Chase v. State*, 645 So. 2d 829, 851 (Miss. 1994).  "The meaning of these words is not obscure and it must be assumed that the members of the jury were . . . of ordinary intelligence and capable of understanding their meaning." *Cannon v. State*, 190 So. 2d 848, 851 (Miss. 1966).

¶66.   Jackson also is correct, however, that this Court has not held it improper for counsel (either for the defense or the prosecution) to discuss or explain the reasonable-doubt standard during closing arguments, as long as counsel does so within proper bounds.

¶67. Here, we find that defense counsel's comparison of "probably committed the crime" and "likely committed the crime" to the reasonable-doubt standard did not cross those bounds. And the trial court erred in sustaining the State's objection to it.

¶68. But we also find the error was harmless in this instance, beyond a reasonable doubt. Accordingly, we reject Jackson's contention that the error requires reversal of his convictions.

## CONCLUSION

¶69. Finding no reversible error in any of Jackson's assignments of fault, we affirm Jackson's convictions for aggravated assault and felon in possession of a firearm.

¶70. **AFFIRMED.**

**WALLER, C.J., RANDOLPH AND KITCHENS, P.JJ., KING, COLEMAN, MAXWELL, CHAMBERLIN AND ISHEE, JJ., CONCUR.**