# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-KA-00250-COA

**LUIS MIGUEL GARCIA-LEBRON**                                      **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                                      **APPELLEE**

DATE OF JUDGMENT:               02/24/2020
TRIAL JUDGE:                    HON. ROBERT B. HELFRICH
COURT FROM WHICH APPEALED:      FORREST COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:         OFFICE OF STATE PUBLIC DEFENDER
                                BY: JUSTIN TAYLOR COOK
ATTORNEY FOR APPELLEE:          OFFICE OF THE ATTORNEY GENERAL
                                BY: META S. COPELAND
DISTRICT ATTORNEY:              LIN CARTER
NATURE OF THE CASE:             CRIMINAL - FELONY
DISPOSITION:                    AFFIRMED - 08/10/2021
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### BEFORE CARLTON, P.J., LAWRENCE AND SMITH, JJ.

### LAWRENCE, J., FOR THE COURT:

¶1.     A jury empaneled in the Forrest County Circuit Court found Luis Miguel Garcia-Lebron guilty of felony child abuse and aggravated domestic violence.[1]  Following his unsuccessful post-trial motion, Garcia-Lebron appeals.  He claims that the circuit court erred by appointing an uncertified interpreter and by allowing the prosecution to elicit excited-utterance hearsay testimony.  Finding no error, we affirm the circuit court's judgment.

---

[1] For the convictions of felony child abuse and aggravated domestic violence, the circuit court sentenced Garcia-Lebron, respectively, to life imprisonment and a consecutive twenty-year sentence in the custody of the Mississippi Department of Corrections.

## FACTS AND PROCEDURAL HISTORY

¶2.     At approximately 4:30 a.m. on January 15, 2019, Anna Lopez[2] rang Miguel Mendoza's doorbell.  Mendoza answered the door and recognized Anna as one of his daughter's friends.  Anna's five-year-old son John was in a shopping cart.  Anna was "very hysterical[.]"  Both of her eyes were black and swollen, and her face was very bruised.  John's face was also injured.  He was bleeding from cuts on his face, his eyes were black, and his nose and mouth were in "very, very bad shape."  Anna told Mendoza that her fiancé, Garcia-Lebron, had beaten her and John.  Mendoza invited Anna and John inside, called the police, and he and his wife tended to them until authorities arrived.

¶3.     Members of the Hattiesburg Police Department arrived before any paramedics. Mendoza helped translate so that Anna could communicate.  Anna's statement led to Garcia-Lebron's arrest.  She and John were admitted to Forrest General Hospital.  Because of the severity of John's injuries, he was later transferred to Batson Children's Hospital in Jackson, Mississippi.  The Hattiesburg Police conducted an investigation and presented the findings to the Forrest County Grand Jury.  Garcia-Lebron was indicted for felony child abuse and aggravated domestic violence.

¶4.     Garcia-Lebron's two-day jury trial began on January 22, 2020. The prosecution called eight witnesses during its case-in-chief.  Mendoza testified regarding his interaction with Anna on the morning of January 15, 2019, and he described her and John's injuries.  Officer Seth Blackmon of the Hattiesburg Police Department explained that he responded to

_____

[2] We use pseudonyms for Anna and her two children to avoid the public disclosure of the victims' identities.

2

Mendoza's house. He noted that Anna "had heavy bruising around . . . both of her eyes" and "some dried blood on her face." John also "had heavy bruising on his face. One of his eyes was bloodshot, and it was still swollen up pretty bad. He also had a pretty significant amount of dried blood and mucus crusted up on his upper lip[,] and his arms were covered in bruises." Officer Blackmon explained that the distance between Mendoza's and Garcia-Lebron's houses was approximately 4.5 miles. Officer Blackmon arrested Garcia-Lebron at work.

¶5.     Anna testified through interpreter Cynthia Baertich. Anna explained that she was an American citizen from Puerto Rico, she was engaged to Garcia-Lebron, and her seven-year-old son, Daniel, and John, who was five years old at the time of his injuries, were children from a previous relationship. Anna further explained that Garcia-Lebron started becoming abusive toward her because he incorrectly thought that she was having affairs with other men. Although Daniel managed to avoid Garcia-Lebron's ire, Garcia-Lebron gradually started physically abusing John when John would accidentally lose control of his bladder or bowels.

¶6.     According to Anna, at some unspecified time during "the week of the 15th of January," Garcia-Lebron "kept asking John if he needed to go to the bathroom, and John was afraid, so he wouldn't answer. And because John wouldn't answer, [Garcia-Lebron] picked up . . . pliers to cut cords or something." Garcia-Lebron then used the pliers to twist and "cut [John's upper] lip[.]" Garcia-Lebron also punched John in the stomach and thighs, "stood on his back[,]" picked up John by the hair and shook him, and gouged his eyes. When Anna

3

tried to intervene, Garcia-Lebron pushed her away.

¶7.     Garcia-Lebron began accusing Anna of having an affair with his boss.  Anna denied his accusations, so Garcia-Lebron punched her in the face, choked her, gouged her eyes, hit her in the head with a can opener, and used a fork to stab her head and back.[3]  Anna left with John at approximately 5:00 p.m. on the evening before she went to Mendoza's house.

¶8.     During Anna's examination, the prosecution introduced seventeen pictures into evidence.  Nine of them depict her injuries, and eight pictures depict John's injuries.  The pictures were all taken while Anna and John were at Forrest General Hospital.  Collectively, Anna's pictures show that her face was covered with bruises and scratches.  Both of her eyes were black and extremely swollen.  She also had bruises on her back, sides, and thighs, and there were a number of small puncture wounds on her back.  One picture appears to show a scalp wound, but it is relatively difficult to discern among her hair.  The pictures of John depict bruises and scratches on his face, back, and legs.  His left eye appears to either be scratched or red.  They also show that his upper lip was very swollen and injured, and most of his mouth was covered in dried blood.  Suffice it to say, the pictures corroborated Anna's testimony regarding her and John's injuries.

¶9.     On cross-examination, defense counsel asked Anna why she did not leave Garcia-Lebron sooner.  Anna explained that she was afraid of him.  And despite defense counsel's insinuations, Anna denied that she was responsible for John's injuries.  Finally, defense counsel noted that Anna did not take Daniel with her when she left with John in an effort to

---

[3] Anna responded affirmatively when the prosecution asked her whether Garcia-Lebron's abuse of her and John were "occurring at the same time[.]"

4

show Garcia-Lebron did not commit the abuse. Anna responded that she could not take Daniel with her because Garcia-Lebron had already taken Daniel with him when he left the house. However, Anna later learned that Daniel went to school the day after she left with John.

¶10. Next, the prosecution called Daniel and then John. During their brief testimonies, they generally corroborated Anna's account. Daniel testified that Garcia-Lebron punched Anna and stabbed her with a fork. He also said that Garcia-Lebron "[p]ush[ed] [John's] eyes." Daniel testified that Anna never hurt John or herself. John testified that Garcia-Lebron hurt his lip. He said that Anna and Daniel never hurt him.

¶11. Edwin Torres testified that he had dated Anna's mother for more than ten years. On the night that Anna left with John, Garcia-Lebron and Daniel showed up at Edwin's apartment. They went back to Garcia-Lebron's house around 10:30 p.m., but Anna had not returned. Since the house did not have electricity, Edwin asked Garcia-Lebron and Daniel to stay with him. The next morning, he made sure that Daniel went to school.

¶12. The prosecution called Jennifer Cheeks to authenticate John's medical records and then called LaTosha Myers as its final witness. Myers explained that during January 2019, she had been a lieutenant with the Hattiesburg Police Department. She was in charge of Anna and John's case. Myers described Anna's and John's injuries and explained her involvement in the case. Myers also testified that she went with John to Batson Children's Hospital and stayed with him until approximately 1:00 a.m. The prosecution rested after Myers testified.

¶13. After unsuccessfully moving for a directed verdict, Garcia-Lebron chose to testify. He denied committing the crimes for which he was charged and testified that John injured himself when he was jumping on a bed. He also testified that Anna caused her own injuries. The defense rested after Garcia-Lebron testified, and the prosecution finally rested without calling any other witnesses. As mentioned above, the jury found Garcia-Lebron guilty of felony child abuse and aggravated domestic violence. Following his unsuccessful post-trial motion for judgment notwithstanding the verdict or for a new trial, Garcia-Lebron appeals.

## ANALYSIS

### I.      Uncertified Interpreter

¶14. Garcia-Lebron first argues that the circuit court erred when it allowed Baertich to act as Anna's interpreter. On January 16, 2020, Garcia-Lebron's attorney filed a "notice of objection" "to the use of a non-court certified interpreter during the trial[.]" The next day, the parties convened for pretrial hearings. The circuit court heard Garcia-Lebron's objection. The prosecutor noted that she had been given the names of two certified court interpreters, but neither of them were available for Garcia-Lebron's trial date. The prosecutor added:

> And then the [Administrative Office of Courts (AOC)] Deputy Director, Lisa Counts, gave us other individual names who weren't certified to contact, and that is the procedure. Ms. Counts also confirmed to me that the oral examination for certification under Mississippi as an interpreter has not been given in the last three years, and it is required. She was familiar with Ms. Baertich's name because Ms. Baertich has passed part of the examination that is required; however, they have not given the orals. The State has not given them, so there's plenty of people out there who could be certified if the State gave the orals, but they just haven't given them. So they're considered non-certified, yet they do practice as interpreters in state and federal court. Cynthia Baertich is a professor at the University of Southern Mississippi; teaches intermediate Spanish. . . . She successfully completed the Mississippi

6

Court Interpreter Credentialing Program on ethics and skill building that was signed by the [AOC], and that she also successfully completed the written examination for the Supreme Court of Mississippi [AOC] for the Court Interpreter Credentialing Program. So she's not passed the oral examination, but they haven't given it . . . in the last three years.

The circuit court noted Garcia-Lebron's objection and concluded that the trial was "allowed to proceed without a certified court" interpreter.

¶15. While Anna was testifying about a picture of John's injuries, Garcia-Lebron's attorney reiterated her earlier objection that Baertich was not a certified court interpreter. Defense counsel then said:

[I]n [Anna's] response, while I do not speak Spanish, I could clearly hear the witness say Garcia-Lebron. However, the interpretation came out and the interpreter said Luis Miguel. So clearly it's not being interpreted exactly as the witness is saying it, and so I will renew my objection to an interpreter that [has] not taken all the exams and been certified by the [AOC].

Baertich responded that the discrepancy was due to the fact that the prosecution was inconsistently referring to the defendant as either Luis Miguel or Garcia-Lebron. However, she responded affirmatively when asked whether she was giving an accurate interpretation pursuant to her oath. As a result, the circuit court overruled defense counsel's objection.

¶16. On appeal, Garcia-Lebron argues that the use of an uncertified court interpreter resulted in reversible error. According to Garcia-Lebron, it is impossible to know whether Baertich accurately translated Anna's testimony. Garcia-Lebron reasons that this Court must reverse and remand this case for a new trial.

¶17. We disagree. Rule 4(A)(2) of the Mississippi Rules on Standards for Court Interpreters allows a court to appoint a "[n]on-credentialed court interpreter" if a certified or

7

registered interpreter is not available, but "only upon a finding that diligent, good faith efforts to obtain an interpreter of higher preference have been made and none has been found to be reasonably available."[4] The prosecution clearly explained that the AOC[5] had provided the names of two certified interpreters, but neither of them were available for Garcia-Lebron's trial. Defense counsel did not request a continuance.

¶18. Furthermore, Rule 4(B)(1) of the Rules on Standards for Court Interpreters states that before a court may appoint a "non-credentialed interpreter," it must find

> (a) that the proposed interpreter appears to have adequate language skills, knowledge of interpreting techniques, and familiarity with interpreting in a court setting; and (b) that the proposed interpreter has read, understands, and agrees to abide by the Mississippi Code of Ethics for Court Interpreters and the Mississippi Rules on Standards for Court Interpreters.[6]

The prosecution provided a certificate demonstrating that Baertich had successfully completed the AOC "Mississippi Court Interpreter Ethics and Skill Building Workshop." The prosecution also provided a letter from the AOC congratulating Baertich for passing "the Written Examination of the Mississippi Court Interpreter Credentialing Program." The exhibits also include Baertich's curriculum vitae. It shows that Baertich has a Bachelor of Arts in Spanish and a "Master of Arts in the Teaching of Languages Spanish/English as a

---

[4] Miss. R. on Standards for Ct. Interpreters 4(A)(2) (Oct. 2011), https://courts.ms.gov/aoc/courtinterpreter/rules_on_standards.pdf.

[5] "The Mississippi Administrative Office of Courts . . . assist[s] in the efficient administration of the nonjudicial business of the [s]tate's court system." State of Mississippi Judiciary, *Administrative Office of Courts*, https://courts.ms.gov/aoc/aoc.php (last visited August 10, 2021).

[6] Miss. R. on Standards for Ct. Interpreters 4(B)(1), *supra* note 4.

8

Second Language." She had been consistently employed as a Spanish professor at the University of Southern Mississippi since 2007. Although the circuit court did not expressly make the findings contemplated in Rule 4(B), we find that omission was harmless error since there was more than sufficient information in the record to support the requisite findings.

¶19. Finally, Garcia-Lebron has not demonstrated that any prejudice resulted from Baertich's translation. In fact, Garcia-Lebron only notes one instance in which Anna said "Garcia-Lebron," but Baertich inaccurately said "Luis Miguel." Baertich explained that she did so because the prosecution inconsistently alternated between the defendant's surname and his first and middle names, and she confirmed that she was translating to the best of her ability. Accordingly, we find no merit to Garcia-Lebron's claim that it was reversible error to allow Baertich to act as a court-appointed interpreter.

## II. Excited-Utterance Hearsay Testimony

¶20. Next, Garcia-Lebron argues that the circuit court erred when it allowed Mendoza to testify as to statements Anna told him on the night of the incident that Garcia-Lebron had injured her and John. At trial, the prosecution asked Mendoza whether he had "a conversation with [Anna] about what had happened to her[.]" After Mendoza responded affirmatively, the prosecution explained that it intended to ask Mendoza about his conversation with Anna. According to the prosecution, Anna's responses to Mendoza "would be excited utterances" that are exceptions to the prohibitions against hearsay testimony. Over defense counsel's objection, the circuit court "allow[ed] . . . limited questioning in that regard." Mendoza then testified that Anna "told [him] that her fiancé had

9

beat her up and the kid, and that as soon as he went out to buy some food or something, she r[a]n away from him." Garcia-Lebron argues that Anna's statement was not an excited utterance because of the length of time between the events and Anna's statement. Garcia-Lebron reasons that the circuit court committed reversible error when it allowed the prosecution to elicit the testimony.

¶21.    "We employ an abuse-of-discretion standard when reviewing claims that the trial judge erred by admitting hearsay." *White v. State*, 48 So. 3d 454, 456 (¶9) (Miss. 2010) (footnote omitted). "[A] trial judge enjoys a great deal of discretion as to the . . . admissibility of evidence[.]" *Butler v. State*, 300 So. 3d 550, 555 (¶14) (Miss. Ct. App. 2020). "[U]nless the judge abuses this discretion so as to be prejudicial to the accused, the Court will not reverse this ruling." *Id*.

¶22.    Hearsay is "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." MRE 801(c). "Hearsay is not admissible except as provided by law." MRE 802. Excited utterances are one of many exceptions to the general prohibition against hearsay testimony. MRE 803(2). An excited utterance is "[a] statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused." *Id*.

¶23.    "There is no hard and fast rule regarding the interval of time that passes between an event and an utterance before the remark necessarily must be classified as outside the excited[-]utterance exception to the hearsay rule. That is a question to be resolved by the

10

trial court in its sound discretion." *Barnett v. State*, 757 So. 2d 323, 329 (¶17) (Miss. Ct. App. 2000) (citation omitted). In *Barnett*, a woman discovered her great-grandson "bleeding and in an apparent state of shock." *Id*. at (¶18). The great-grandmother later testified that the child said that the accused hurt his mother and put her in the trunk of a car. *Id*. This Court found that the trial court did not abuse its discretion when it allowed the great-grandmother's testimony "despite the passage of several hours between the event and the utterance" because "the child was still under the influence of the event[.]" *Id.* at 330 (¶18).

¶24. Here, it was similarly within the circuit court's discretion to allow Mendoza to relay Anna's statement that Garcia-Lebron injured her and John; particularly since Mendoza had already described Anna as "very hysterical and crying and bleeding" when she showed up on his doorstep at approximately 4:30 in the morning. Although several hours had passed since the actual abuse, Anna was certainly still under the influence of the events and relayed a statement explaining why she and John suddenly appeared at Mendoza's door. We find that Anna's statement was an excited utterance and admissible as such.

¶25. Further, assuming for the sake of argument that the circuit court abused its discretion when it allowed the testimony at issue, we find that the statement's admission would be harmless and not reversible error. *See Chaupette v. State*, 136 So. 3d 1041, 1047 (¶12) (Miss. 2014) ("We will not reverse a conviction based on a harmless error."). "For a case to be reversed on the admission or exclusion of evidence, it must result in prejudice and harm or adversely affect a substantial right of a party." *Jackson v. State*, 245 So. 3d 433, 439 (¶32) (Miss. 2018). Anna, John, and Daniel all testified that Garcia-Lebron was responsible for

11

Anna's and John's injuries. Thus, even if Mendoza had not been allowed to say that Anna blamed Garcia-Lebron for her and John's injuries, Anna and her children would have given more prejudicial testimony against Garcia-Lebron that would have been sufficient to support the same convictions.

## CONCLUSION

¶26.    The circuit court did not commit reversible error when it allowed Baertich to act as Anna's interpreter despite the fact that Baertich was not a certified interpreter. There was sufficient evidence in the record to support accepting Baertich under Rule 4(B)(1) of the Rules on Standards for Court Interpreters. Additionally, we find no merit to Garcia-Lebron's claim that the circuit court abused its discretion when it allowed the prosecution to elicit Mendoza's testimony concerning Anna's excited utterance blaming Garcia-Lebron for her and John's injuries. Accordingly, we affirm the circuit court's judgment.

¶27.    **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, McDONALD, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.**

12