# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-KA-00214-COA

JUSTYN MATTHEW SCHLEGEL A/K/A            APPELLANT
JUSTYN SCHLEGEL

v.

STATE OF MISSISSIPPI            APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 11/30/2017 |
| TRIAL JUDGE: | HON. CHRISTOPHER A. COLLINS |
| COURT FROM WHICH APPEALED: | NESHOBA COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: JUSTIN TAYLOR COOK |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: KAYLYN HAVRILLA McCLINTON |
| DISTRICT ATTORNEY: | STEVEN SIMEON KILGORE |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 03/10/2020 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE CARLTON, P.J., WESTBROOKS AND McCARTY, JJ.**

**CARLTON, P.J., FOR THE COURT:**

¶1.     A Neshoba County Circuit Court jury convicted Justyn Schlegel of second-degree murder.  The trial court sentenced Schlegel to serve forty years in the custody of the Mississippi Department of Corrections (MDOC).

¶2.     Schlegel now appeals his conviction and sentence.  On appeal, Schlegel asserts nine assignments of error.  After our review, we find no error.  We therefore affirm Schlegel's conviction and sentence.

## FACTS

¶3. On June 14, 2015, Schlegel was incarcerated in the Neshoba County Jail. That morning, Schlegel and Rexdale Henry were the only two inmates housed in a cell known as Detox 2. At approximately 10:15 a.m., jail staff checked on Henry after observing that he was unresponsive in the cell. Jail staff discovered that Henry had died. An autopsy revealed Henry's cause of death was multiple blunt trauma, with the manner of death being homicide.

¶4. After an investigation by the Neshoba County Sheriff's Department and the Mississippi Bureau of Investigation, Schlegel was arrested for Henry's murder. The grand jury indicted Schlegel for first-degree murder pursuant to Mississippi Code Annotated section 97-3-19(1)(a) (Rev. 2014).

¶5. A jury trial was held in November 2017. After the State rested, the defense moved for a directed verdict, which the trial court denied. The defense also made a motion to dismiss Schlegel's charges based on the spoliation of evidence. The defense argued that the State failed in its duty to preserve surveillance video recordings that showed various angles of the jail and were relevant evidence in this case. After hearing arguments from both parties, the trial court denied Schlegel's motion to dismiss due to Schlegel's failure to show any bad faith by the State.

¶6. The jury found Schlegel guilty of second-degree murder, and the trial court sentenced Schlegel to serve forty years in the custody of the MDOC. Schlegel filed posttrial motions, which the trial court denied. Schlegel timely appealed.

¶7. On appeal, Schlegel asserts nine assignments of error. For purposes of clarity, we have combined several of these issues.

2

## DISCUSSION

### I.        Preservation of Evidence

¶8.      Schlegel first argues that the State violated his due process rights by losing or otherwise failing to preserve the surveillance video recorded by the jail's surveillance cameras around the time of Henry's death as well as the surveillance video recording from a camera facing another angle of the jail.  The record also reflects that the only surveillance video recordings in evidence were from the video camera facing Detox 2.  However, Investigator Ralph Sciple of the Neshoba County Sheriff's Department and Agent Heather Richardson of the Mississippi Bureau of Investigation testified that another video camera was located by the sally port entrance,[1] which showed another angle of the jail.[2]

---

[1] A sally port in a jail is "a secure entryway (as at a prison) that consists of a series of doors or gates." *Sally port*, Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/sally%20port (last visited March 10, 2020). The record reflects that in the Neshoba County Jail the sally part is connected to the booking room.

[2] In his appellate brief, Schlegel argues that three hours of surveillance video recordings from the Neshoba County Jail on the date of Henry's death are missing; namely, the recordings between the hours of 4:00 a.m. and 7:00 a.m. on July 14, 2015, during the time that Henry was alone in Detox 2.  The record reflects that the trial court held a pretrial hearing on Schlegel's motion to compel the State to produce the missing three hours of video from July 14, 2015, or to dismiss the charges.  At the hearing, the State explained that the video recordings at issue no longer exist due to an unintentional error that occurred when the jail switched to a new software system:

> Your Honor, it was . . . the old jail system, when they went to highlight the videos and slide them over to be written onto the disk, this one didn't make it.  It was five days' worth on several disks, and for some reason it got mixed up and it did not transfer over to the disk.  Do we wish we had it? Absolutely.  We want it.  It hurts us more than it hurts them that it does not exist anymore.  The jail is on a new software now.  That video is gone.

¶9.     "The State has the duty to preserve evidence . . . which might be expected to play a

significant role in the suspect's defense." *Northup v. State*, 793 So. 2d 618, 623 (¶16) (Miss.

2001) (internal quotation mark omitted).  To determine whether the State violated Schlegel's

due process rights based upon destruction or spoliation of evidence, Schlegel must show the

following:

> (1) the evidence in question must possess an exculpatory value that was
> apparent before the evidence was destroyed; (2) the evidence must be of such
> a nature that [Schlegel] would be unable to obtain comparable evidence by
> other reasonably available means; and (3) the prosecution's destruction of the
> evidence must have been in bad faith.

*Robinson v. State*, 247 So. 3d 1212, 1234 (¶56) (Miss. 2018), *cert. denied*, 139 S. Ct. 829

(2019).  Schlegel must meet all three of these requirements to successfully prove that his due

---

> [Investigator Ralph Sciple] and [Agent Heather Richardson] spent
> several days combing through everything they have done with this case.
> Ralph went through every computer at the jail that there was a possibility it
> might be on, and Heather did the same with her old computers and anything
> she used to spend time on this case.  It simply didn't get transferred to the disk
> or copied, and nobody caught it until—I suppose until [the defense] was
> reviewing the videos.
>
>        It was unintentional.  Nobody meant to erase them.  We need them.
> We wish we had them.  They are gone.

The record reflects that the trial court granted Schlegel's motion to compel "all video *that
does exist* between 4:00 a.m. and 7:00 a.m." (Emphasis added).  Upon reviewing the record,
it appears from the transcript that the State eventually recovered the three hours of video and
turned it over to the defense.  The record reflects that State's Exhibit 18, a disc labeled "7-
14-2015; 0400-0700," was admitted into evidence at trial.  Although the record does not
clearly indicate at what point the video recording from 4:00 a.m. to 7:00 a.m. on July 14,
2015, was recovered, this video recording was admitted into evidence.  Agent Richardson's
testimony at trial also indicates that the recording was eventually recovered.  We will
therefore limit our discussion to Schlegel's argument regarding the video recording showing
another angle of the jail.

4

process rights were violated. *Childs v. State*, 133 So. 3d 348, 350 (¶10) (Miss. 2013).

¶10. Upon our review, we find that Schlegel has failed to prove the third prong of this test. "Unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process." *Young v. State*, 236 So. 3d 49, 56 (¶31) (Miss. 2017). The supreme court has explained that "[b]ad faith, the third and final prong, is defined as 'not simply bad judgment or negligence, but rather conscious doing of a wrong because of dishonest purpose or moral obliquity.'" *Robinson*, 247 So. 3d at 1234-35 (¶57) (quoting *Murray v. State*, 849 So. 2d 1281, 1286 (¶19) (Miss. 2003)). We recognize that "[a] due-process violation occurs only 'where the spoliation or destruction was intentional and indicates fraud and a desire to suppress the truth.'" *Id*. at 1235 (¶57) (quoting *Tolbert v. State*, 511 So. 2d 1368, 1372 (Miss. 1987)).

¶11. Schlegel argues that the State's actions of failing to copy the video evidence from a system the State knew, or should have known, would delete itself "is textbook bad faith." Schlegel claims, however, that his ability to show bad faith is restricted by the fact that the video recording itself is destroyed, and he contends that "the bad faith requirement is a burden most defendants can never reach, absent a confession by the State to the effect of 'I destroyed the evidence because it was exculpatory.'"[3]

---

[3] In his reply brief, Schlegel cites to *Freeman v. State*, 121 So. 3d 888 (Miss. 2013), in support of his argument on spoliation of the evidence. In that case, "the defendant and the county court deemed the evidence material to the defense, and, as a result, the county court ordered the State to preserve the evidence." *Id*. at 895 (¶16). Despite that order, the State informed Freeman through discovery that the video had been destroyed. *Id*. at 891 (¶5). On appeal, the supreme court clarified that because "the State was under an affirmative duty via a court order to preserve the video, . . . this case presents a unique factual scenario that is not adequately addressed by the typical application of the three-part test." *Id*. at

¶12.	Regarding the video recording showing another angle of the jail, Agent Richardson testified that all of the video recordings from the camera above the sally port entrance showed "the same things" as the video recording from the camera facing Detox 2.  Agent Richardson testified that she determined that the camera facing Detox 2 showed a better angle of the cell, and she turned over the video recordings that "were substantial to the case." Agent Richardson testified that she believed the other video recordings were still on the system.

¶13.	After the State rested, Schlegel moved for a directed verdict and to dismiss the charges against him for spoliation of evidence.  Schlegel argued that during Agent Richardson's testimony, the defense learned that Agent Richardson once had in her possession a video recording from a different camera angle than the video recording admitted into evidence.  During arguments on Schlegel's motion to dismiss, Agent Richardson clarified that she did not deliberately try to conceal any video recordings from another angle; she simply determined that the camera facing Detox 2 showed a better angle of the cell. Agent Richardson confirmed that if the camera above the sally port entrance had showed a better picture of Henry or Schlegel's movements, she would have used the recording from that camera instead.

¶14.	Investigator Sciple also testified at the hearing on Schlegel's motion to dismiss.  He initially stated that he did not review the video from the camera above the sally port entrance because he "[did not] believe you could see in the cell itself from that camera."  Investigator

895 (¶16).

Sciple later clarified at trial that "I'm sure I reviewed [the recording] back then, but I did not see anything to record." Investigator Sciple testified that if there was any evidence on the video recording from the camera above the sally port entrance to show that Schlegel did not kill Henry, he would have recorded it.

¶15. When asked whether the video recording from the camera above the sally port entrance still exists, Investigator Sciple responded "It might not now, but it did at that time, yes, sir." Investigator Sciple explained that if you do not download and preserve surveillance video recordings on to the jail's software system, the recording "just rolls over and rolls over until it disappears." Investigator Sciple estimated that it takes several months before video recordings are deleted from the system. Investigator Sciple testified that he did not deliberately destroy any video recordings nor did he let recordings get erased for the purpose of preventing the defense from using the recordings.

¶16. In *Ellis v. State*, 77 So. 3d 1119, 1123 (¶14) (Miss. Ct. App. 2011), Kenneth Ray Ellis argued his due process rights were violated because a state trooper failed to preserve a memory card containing a video recording of a traffic stop that eventually led to Ellis's DUI arrest. On appeal, this Court found that Ellis failed to show bad faith because by the time Ellis's attorney requested a copy of the video recording, the video recording had already been erased in the usual process of recording over older videos on the memory card. *Id*. at 1124 (¶21). The officer testified that unless there was something unusual about the stop, he simply records over the video. *Id*. The officer also testified that he did not record over Ellis's stop to prevent it from being disclosed. *Id*. This Court found that because the officer had acted

7

"in good faith and in accord with his normal practice," no due process violation occurred.

*Id*.

¶17. In the present case, our review of the record reflects no evidence of bad faith on the part of the State regarding the video recording. Schlegel's claim of a due process violation therefore fails. *See Mason v. State*, 247 So. 3d 362, 364 (¶6) (Miss. Ct. App. 2018).

### A. Brady *Violation*

¶18. Schlegel also asserts that the State violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to turn over the video recording at issue. Schlegel argues that prior to trial, he filed a motion specifically requesting "any physical evidence and photographs relevant to the case" and "any exculpatory material concerning the [d]efendant."

¶19. In *Brady*, the United States Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87. In *Manning v. State*, 929 So. 2d 885, 891 (¶15) (Miss. 2006), the Mississippi Supreme Court established a four-part test to assess whether a *Brady* violation had occurred, thus mandating a new trial:

> The defendant must prove: (a) that the State possessed evidence favorable to the defendant (including impeachment evidence); (b) that the defendant does not possess the evidence nor could he obtain it himself with any reasonable diligence; (c) that the prosecution suppressed the favorable evidence; and (d) that had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different.

¶20. The supreme court has emphasized that when examining whether a *Brady* violation occurred, "the question is whether there is a 'reasonable probability' that the verdict would

have been different but for governmental evidentiary suppression which 'undermines confidence in the outcome of the trial.'" *Carr v. State*, 873 So. 2d 991, 1000 (¶12) (Miss. 2004) (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)). The supreme court explained that "[t]he government could violate *Brady* if it failed to turn over exculpatory evidence, even if it was never requested, when suppression of the evidence would be of sufficient significance to result in the denial of the defendant's right to a fair trial." *Id.* (internal quotation marks omitted).

¶21. Regarding the first element, which requires Schlegel to show that the State possessed evidence favorable to him, including impeachment evidence, Investigator Sciple testified that during his investigation, he viewed the recording from the video camera above the sally port entrance. Investigator Sciple stated that if there had been any evidence on that recording to show that Schlegel did not kill Henry, he would have recorded it. Furthermore, as stated above, the State no longer possessed the evidence. The State testified at trial that the video recording at issue no longer existed. Investigator Sciple explained that if you do not download and preserve surveillance video recordings onto the system, they are eventually deleted from the system. We therefore find that Schlegel failed to meet the first element by not proving that the State possessed evidence favorable to Schlegel that was either exculpatory or impeaching. *See Davis v. State*, 174 So. 3d 299, 306 (¶22) (Miss. Ct. App. 2015).

¶22. As to the fourth element, Schlegel asserts that a reasonable probability exists that the exculpatory or impeachment value of the video recording would have resulted in a different

outcome. Schlegel submits that his theory of defense might have been supported by the video recording and that the State's theory would have been subject to impeachment and disbelieved by the jury. However, Agent Richardson testified that if the recording from the video camera at the sally port entrance had showed a better angle of Henry's or Schlegel's movements, she would have used that recording for evidentiary purposes instead of the recording from the video camera facing Detox 2. "But more importantly," as we will discuss below, "we find that overwhelming evidence existed to support the jury's verdict," and therefore the introduction of the video recordings at issue were "highly unlikely to affect the outcome." *Chamberlin v. State*, 55 So. 3d 1046, 1056 (¶33) (Miss. 2010).

¶23. After our review, we find that Schlegel failed to meet his burden of proving the four elements necessary to prove a *Brady* violation. *Id*.

### B. Spoliation of Evidence Jury Instruction

¶24. Schlegel next argues that the trial court erred by failing to grant his requested jury instruction regarding spoliation of evidence. The jury instruction at issue, D-16, set forth as follows:

> Evidence was received by Mississippi Bureau of Investigations and Neshoba County [Sheriff's] Department, namely a security video surveillance recording which captured the view of the book-in area of the Neshoba County Jail from above the entrance-way of the sally port of said [j]ail. That the video recording was in the exclusive possession of the Mississippi Bureau of Investigations and the Neshoba County [Sheriff's] Office, but [i]t was deleted even though the Mississippi Bureau of Investigations and the Neshoba County [Sheriff's] Office were aware of their responsibility under Mississippi law to safely keep the video recordings so that it could be used as evidence at trial. Further, Mississippi Bureau of Investigations and the Neshoba County [Sheriff's] Office were aware of Justyn Schlegel's rights under Mississippi law to inspect and view the video recordings prior to trial.

10

From this you may infer, though you are not compelled to do so, that if the video recordings were produced in court it would be damaging to the State's case. You may give this inference such force and effect as you think it should have under all of the facts and circumstances.

¶25.    We review the decision to give or refuse a requested jury instruction for an abuse of discretion. *Victory v. State*, 83 So. 3d 370, 373 (¶12) (Miss. 2012). We recognize that although "[a] defendant is entitled to have jury instructions given which present his theory of the case[,] . . . this entitlement is limited in that the [trial] court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence." *Id*.

¶26.    In the present case, the State objected to proposed jury instruction D-16. Schlegel's counsel then argued that the defense had met the three-part test for showing that Schlegel's due process rights were violated based upon destruction or spoliation of evidence, and therefore Schlegel was entitled to an instruction informing the jury that they could conclude the missing video evidence was exculpatory in nature. After hearing arguments, the trial court ruled that the instruction was improper and refused it, explaining, "I think it singles out evidence and comments on evidence in an improper way[.]" The trial court later expounded upon its ruling, stating, "I still am of the opinion . . . that exculpatory value was not apparent six or eight weeks after—in the timeline that it would have been recorded over. I do feel . . . much more assured that there is no evidence of bad faith in these circumstances."

¶27.    The supreme court has held "that a defendant is not entitled to a spoliation instruction absent evidence that the State destroyed the evidence with an intent to suppress the truth." *Roberson v. State*, 199 So. 3d 660, 666 (¶25) (Miss. 2016); *see also Snyder v. State*, 174 So.

3d 331, 337 (¶30) (Miss. Ct. App. 2015) (For a defendant "to be entitled to a spoliation instruction there must be evidence of intentional destruction of the evidence." (emphasis omitted)). In *Fairley v. State*, 275 So. 3d 1012, 1024 (¶59) (Miss. 2019), *cert. denied*, No. 19-7422, 2020 WL 873815 (U.S. Feb. 24, 2020), the supreme court held that the defendant was not entitled to a spoliation instruction where "no evidence was presented at trial that the audio recording of [the defendant's] interview was purposefully taped over or erased in bad faith." *See also Snyder*, 174 So. 3d at 337-38 (¶31) (holding that a defendant failed to present evidence that a video was intentionally destroyed and refusing to instead infer that the video was erased in bad faith).

¶28. As stated above, Schlegel failed to present evidence to show that the State intentionally destroyed the video recording at issue. We therefore find that the trial court properly refused Schlegel's spoliation instruction.

## II. Discovery Violation

¶29. Schlegel argues that on top of the constitutional violations he has raised, the State's failure to preserve and provide Schlegel with the video recording at issue violated his discovery rights under the Mississippi Rules of Criminal Procedure. However, the State maintains that no discovery violation occurred because the State was no longer in possession of the video recording.[4]

---

[4] In his reply brief, Schlegel asserts that the State failed to respond to his arguments on appeal that the failure to turn over the video recording in question was also a violation of the Mississippi Rules of Criminal Procedure. Schlegel cites to *Trammell v. State*, 622 So. 2d 1257, 1261 (Miss. 1993), and argues that because the State did not address that issue, it is confessed. However, our review of the State's appellate brief shows that the State responded to Schlegel's assignment of error with the following two sentences: "Moreover,

12

¶30.    Mississippi Rule of Criminal Procedure 17.2 requires, in pertinent part, the State to turn over "[a]ny exculpatory material concerning the defendant" that "is in the possession, custody, or control of the State[.]" *See* MRCrP 17.2(6).  At trial, Schlegel moved to dismiss the charges based on spoliation of the evidence, arguing that at one point the State had in its possession video recordings from another camera showing a different angle of the jail.  As stated, the trial court denied Schlegel's motion to dismiss.  However, the trial court ordered the State to provide to the defense any evidentiary video recording that does exist, explaining "I absolutely believe [Schlegel is] entitled to it *if it does exist*." (Emphasis added).  Regarding video recordings from the other camera, Investigator Sciple testified that the recording may no longer exist and explained that if you do not download and preserve surveillance videos on to the system, the recordings are eventually deleted from the system.

¶31.    The "failure to make or cooperate in discovery should first be resolved by making a motion in the proper court requesting an order compelling such discovery." *Caracci v. Int'l Paper Co.*, 699 So. 2d 546, 557 (¶19) (Miss. 1997) (citing M.R.C.P. 37(a)(2)).  The record reflects that based on motions made by Schlegel before and during trial, the trial court ordered the State to produce the video recording at issue *if it existed*.  The State testified that the video recording at issue no longer existed.  Because the video recording was no longer "in the possession, custody, or control of the State," we cannot say that the State violated the

the State did not violate the rules of court governing discovery when it failed to turn over the three hour recording because it was no longer in its possession and had been destroyed after it was accidentally omitted from the disk.  The recording did not contain any exculpatory material and the defense's acknowledgment of such is contained in the pretrial motion hearing."

trial court's order or committed a discovery violation. *See* MRCrP 17.2(6).

## III. Admission or Exclusion of Evidence

¶32. We review a trial court's admission or exclusion of evidence for an abuse of discretion. *Jackson v. State*, 245 So. 3d 433, 439 (¶32) (Miss. 2018). "For a case to be reversed on the admission or exclusion of evidence, it must result in prejudice and harm or adversely affect a substantial right of a party." *Id*.

### A. Testimony of Angela Skinner and Corresponding Medical Records

¶33. Schlegel argues that the trial court erred in limiting the scope of family nurse practitioner Angela Skinner's testimony, as well as the medical records Schlegel sought to admit through her. Schlegel asserts that the trial court's ruling disregarded Schlegel's constitutional right to assert a theory of defense and is therefore reversible error.

¶34. The supreme court has explained that "[i]f the circuit court determines that the defendant's newly-discovered evidence or witnesses are prejudicial to the State, the State must ask for a continuance so that it may review the evidence or interview the witnesses and thus become prepared to counter the same." *Morris v. State*, 927 So. 2d 744, 747 (¶8) (Miss. 2006).[5] The supreme court cautioned that "[e]ven if the State does not ask for a continuance,

---

[5] The *Morris* court applied and discussed Mississippi Uniform Rule of Circuit and County Court Practice 9.04. These rules no longer govern criminal practice in Mississippi and have been replaced by the Mississippi Rules of Criminal Procedure. The Mississippi Rules of Criminal Procedure took effect prior to Schlegel's trial. Uniform Rule 9.04 now is encompassed in Mississippi Rule of Criminal Procedure 17.9, which provides that

> [i]f, at any time prior to trial, it is brought to the attention of the court that a party has failed to comply with an applicable discovery rule . . . , the court may order such party to permit the discovery of the material and information

14

the circuit court cannot exclude the evidence [because] [t]o do so would . . . violate the Compulsory Process Clause." *Id*. (citation omitted). "The Compulsory Process Clause bestows upon a criminal defendant 'the right to compel the presence and present the testimony of witnesses.'" *Id*. at 747 n.1 (quoting *Taylor v. Illinois*, 484 U.S. 400, 409 (1988)).

¶35.    However, the supreme court has carved out an exemption in cases where the trial court "determines that the defendant's discovery violation is willful and motivated by a desire to obtain a tactical advantage[.]" *Id*. at (¶9) (internal quotation marks omitted). In such cases, "the newly-discovered evidence or witnesses may be excluded." *Id*. We recognize the supreme court's warning that the "exclusion of evidence is a radical sanction that 'ought be reserved for cases in which the defendant participates significantly in some deliberate, cynical scheme to gain a substantial tactical advantage.'" *Myers v. State*, 145 So. 3d 1143, 1149 (¶15) (Miss. 2014) (quoting *Houston v. State*, 531 So. 2d 598, 612 (Miss. 1988)). The supreme court has held that the trial court "cannot disregard the 'fundamental character of the defendant's right to offer the testimony of witnesses in his favor.'" *Id*. (quoting *Coleman v. State*, 749 So. 2d 1003, 1009 (¶16) (Miss. 1999)); *see also Williams v. State*, 54 So. 3d 212, 215 (¶13) (Miss. 2011) ("While avoiding unfair surprise to either the defense or prosecution is a fundamental policy of criminal procedure, nothing is more fundamental than an accused's right to present witnesses in his own defense.").

---

not previously disclosed, grant a continuance, or enter such other order as it deems just under the circumstances.

MRCrP 17.9(a).

15

¶36.     In examining whether the trial court erred in excluding or limiting evidence, we recognize that "[t]he crux of the issue is whether [Schlegel] was prejudiced by the trial court's excluding and/or limiting the testimony of [Skinner]" as well as the medical records. *Morris v. State*, 927 So. 2d 744, 746 (¶7) (Miss. 2006).  "The admission or exclusion of evidence constitutes reversible error only where a party can show prejudice or harm." *Williams v. State*, 54 So. 3d 212, 216 (¶14) (Miss. 2011).

¶37.     The record reflects that on November 2, 2017, four days prior to trial, the defense notified the State via email that it intended to call Skinner to testify at the trial.[6]  The defense also provided two pages of medical records from Schlegel's June 25, 2014 ER visit where he was treated by Skinner.  The State filed a motion to strike Skinner's expert testimony based on the fact that Schlegel's expert designation and disclosure was untimely.

¶38.     In a pretrial hearing on the motion, defense counsel[7] clarified that they were not offering Skinner as an expert, but rather as a factual witness to discuss Schlegel's diagnosis of plantar fasciitis.  The trial court therefore ruled that because Schlegel was not offering Skinner as an expert witness, there could be no motion to strike her as an expert witness.  The State then made an ore tenus motion in limine to prohibit the elicitation of any expert opinion from Skinner.  The trial court stated that it would rule on the motion in limine during the course of the trial.

---

[6] The transcript also reflects that on October 31, 2017, the defense disclosed Skinner as a witness to the State.

[7] Schlegel's trial counsel were Rosalind Jordan and Richard Carter.  To avoid confusion, we will refer to them collectively as "defense counsel" and "they," to avoid switching between gender-specific pronouns.

¶39. At trial, defense counsel again stated that they were not trying to introduce Skinner as an expert witness; rather, they were "only trying to introduce the [medical] records and . . . authenticate them through [Skinner]." Defense counsel sought to enter into evidence twelve pages of medical records from Schlegel's June 25, 2014 emergency room visit.

¶40. Regarding the scope of Skinner's testimony, the trial court held that as follows:

> It is my belief that the witness, Angela Skinner, I think it is impossible for us to scrub her clean from being an expert witness which makes me consider that she was not timely designated, and I am mindful of how long this litigation has been going on, and that that condition that she is going to offered to testify regarding is something that would have been discoverable sooner by the defense in the time that this case has been pending.

The trial court ultimately ruled that Skinner could testify, but not as an expert. The trial court also limited the defense to admitting only two of the twelve pages of medical records.

¶41. Schlegel argues on appeal that the trial court based its ruling limiting Skinner's testimony and the corresponding medical records on the fact that this evidence was disclosed outside the timeline proscribed by the trial court. However, our review of the record shows that a more significant concern for the parties and the trial court was whether Skinner could testify as an expert witness or lay witness. The transcript reflects that the discussion regarding limitations on Skinner's testimony centered on whether Skinner could testify as an expert witness or lay witness.

¶42. During a hearing on the matter, defense counsel argued that they intended to introduce evidence that Schlegel suffered from "plantar fasciitis" to explain the bruises on Schlegel's feet. Defense counsel asserted that in Agent Richardson's report, she observed a large bruise on the bottom of Schlegel's foot that Schlegel could not explain. Defense counsel explained

17

that they then subpoenaed Skinner and the medical records concerning the bottom of Schlegel's feet. Defense counsel argued that they intended to use Skinner's testimony to introduce evidence supporting their theory of defense; namely, that Schlegel suffered from plantar fasciitis, which would explain the bruise on the bottom of his feet. Defense counsel informed the trial court that Skinner could testify as a lay witness and describe the symptoms of plantar fasciitis:

> Well, Your Honor, the common symptoms, and this Court has even said, [plantar fasciitis] is a common illness that people suffer from, and it doesn't really amount to expert opinion testimony anyway to describe the symptoms. It's just lay witness testimony. It'd be like describe the symptoms of a cold. A lay person can say that. Well, you have a runny nose and you're sneezing or coughing, maybe running a little fever. That does not amount to an expert testimony.

Defense counsel even informed the trial court that if the twelve pages of medical records could be introduced at trial, then "[Skinner] doesn't have to testify at all."

¶43. In response, the State argued that "the [medical] records are a backdoor attempt to get expert opinions in regards to diagnosis, symptoms, physical and history, clinical impressions, all of this is contained in the four corners of these documents. These are expert opinions contained in these documents. Even the diagnosis is an expert opinion."

¶44. Mississippi Rule of Evidence 701 provides:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
>
> (a)     rationally based on the witness's perception;
>
> (b)     helpful to clearly understanding the witness's testimony or to determining a fact in issue; and

18

    (c)  not based on scientific, technical, or other specialized
        knowledge within the scope of Rule 702.

Additionally, the supreme court has held that nursing experts cannot testify as to diagnostic

impressions "because nurses are not qualified to make medical diagnoses or attest to the

causes of illnesses." *Vaughn v. Miss. Baptist Med. Cent.*, 20 So. 3d 645, 652 (¶20) (Miss.

2009); *see also Young v. State*, 106 So. 3d 775, 782 (¶27) (Miss. 2012). We therefore find

that the trial court was within its discretion to limit the scope of Skinner's testimony to that

of a lay witness.

¶45. Regarding the timeliness of the disclosure in the case before us, the trial court stated

that it was "mindful of how long this litigation has been going on, and that that condition that

she is going to offer[] to testify regarding is something that would have been discoverable

sooner by the defense in the time that this case has been pending." In addition to limiting

Skinner's testimony, the trial court also allowed the defense to enter only two of the twelve

pages of medical records into evidence. These two pages were published to the State prior

to trial when Schlegel disclosed Skinner as a witness.

¶46. At trial, Skinner testified that on June 25, 2014, she was working at the Neshoba

General Emergency Room (ER). On that day, Schlegel reported to the ER complaining of

"knots on the bottom of both of his feet" that he had been suffering from for five months.

In her medical notes from Schlegel's ER visit, Skinner described Schlegel's knots as

"bilateral plantar surface nodules," and she noted that they were "painful." During Skinner's

testimony, the defense admitted the two pages of medical records into evidence. These two

pages of medical records from Schlegel's ER visit reflect a "clinical impression" that

19

Schlegel suffered from plantar fascia nodules.

¶47. Schlegel also testified at trial about his treatment with Skinner, explaining that he sought treatment from Skinner in June 2014 for "plantars feet." Schlegel explained that as a result of plantars feet, his feet were painful, sensitive, bruised, and swollen when he wakes up in the morning. Schlegel testified that he suffered from this condition in 2015. Regarding the three photographs of his feet, Schlegel testified that he received one of the bruises on the top of his foot after a horse stepped on him four years ago.

¶48. After our review, we find no reversible error in the trial court's limitation of Skinner's testimony and the medical records. Furthermore, any error that did occur by limiting Skinner's testimony and the medical records was harmless and did not result in prejudice or harm to Schlegel's theory of defense. *See Jackson*, 245 So. 3d at 439 (¶32). Our review of the transcript shows that the defense was able to present their theory of defense that the bruises on Schlegel's feet resulted from plantar fasciitis and were not a result of Schlegel stomping on Henry. As stated, Skinner testified that Schlegel reported to the ER complaining of painful knots on the bottom of his feet. The medical records entered into evidence reflect a "clinical impression" that Schlegel suffered from plantar fascia nodules. Schlegel also testified that he suffered from painful, sensitive, and bruised feet during the time period of Henry's death. We find that the trial court did not abuse its discretion in limiting Skinner's testimony and the corresponding medical records.

B. *Photographs of Schlegel's Feet*

¶49. Schlegel also asserts that the trial court erred in allowing the State to introduce into

evidence three photographs of Schlegel's feet taken by Agent Richardson on July 17, 2015, two days after Henry's death. Schlegel asserts that the State failed to disclose these photographs in a timely manner and therefore "ambushed" Schlegel's defense. Schlegel complains that the trial court prevented him from introducing Skinner's full testimony and the entirety of the medical records due to untimeliness but that the trial court did not penalize the State for its own untimely disclosure.

¶50. The State offered into evidence three photographs of Schlegel's feet. The photographs were taken two days after Henry's death and showed bruises on both of Schlegel's feet. The defense objected to all three photographs being entered into evidence based on the timeliness of the State's disclosure. The defense argued that in their motion for discovery, they requested any photographs intended to be introduced at trial. However, the defense acknowledged that the District Attorney's office did not have the photographs in its possession until November 3, 2017 (three days before the trial). The defense agreed that the State provided the photographs to the defense the same day the State received them.

¶51. Regarding the timeliness of the disclosure, counsel for the State explained he had not been familiar with the case file, so he was listening to a recorded audio interview between Agent Richardson and Schlegel. During the interview, counsel for the State heard Agent Richardson instruct Schlegel to show her his hands, then his feet, and then his legs. Counsel explained that he could hear the "clicking" of a camera, which alerted him for the first time that the photographs existed. The State requested the photographs and received them on Friday, November 3, 2017. The State turned the photographs over to the defense that same

21

day.

¶52.    The trial court ruled that the three photographs could be admitted, explaining:

> I find that the disclosure of the photographs at 4:41 p.m. last Friday was not
> an intentional act on behalf of the State.  I believe that they were disclosed as
> soon as they could be by the State of Mississippi upon discovery of the
> photographs.  I reviewed those three photographs yesterday.  We all did,
> looked at them in this room.  They will be admissible photographs in this trial.

¶53.    As stated, we review a trial court's admission of evidence for an abuse of discretion. *Jackson*, 245 So. 3d at 439 (¶32).  For the admission of evidence to amount to reversible error, the admission "must result in prejudice and harm or adversely affect a substantial right of a party."  *Id*.  Here, the trial court found no willful nondisclosure by the State.  Our review of the record also confirms that the defense was able to offer an explanation regarding Schlegel's bruised feet through Skinner's testimony and the medical records showing that Schlegel suffered from plantar fasciitis, as well as through Schlegel's own testimony stating that he suffered from plantar fasciitis and suffered bruising on his foot when a horse stomped on him.  Schlegel failed to show that he was prejudiced by the photographs being entered into evidence.  Accordingly, we find no abuse of discretion by the trial court in admitting the photographs.

### IV.    *Weathersby*[8] Rule

¶54.    Schlegel asserts that he is entitled to an acquittal as a matter of law pursuant to the *Weathersby* rule.  The *Weathersby* rule sets forth that

> where the defendant or the defendant's witnesses are the only eyewitnesses to
> the homicide, their version, if reasonable, must be accepted as true, unless

---

[8] *Weathersby v. State*, 165 Miss. 207, 147 So. 481 (1933).

22

> substantially contradicted in material particulars by a credible witness or witnesses for the state, or by the physical facts or by the facts of common knowledge.

*Page v. State*, 64 So. 3d 482, 488 (¶28) (Miss. 2011). The supreme court has explained that "where conflicting eyewitness testimony is presented or physical evidence is presented in opposition to the defendant's claim, 'the case then becomes an issue for the jury.'" *Id*. at 488-89. "The jury is to determine if the defendant's testimony is the more credible version of events and to decide either to convict or to acquit." *Id*. at 489 (¶28) (citation omitted).

¶55. The record before us reflects that Schlegel failed to argue the *Weathersby* rule as a ground for his directed verdict or in his motion for a new trial. The supreme court has held that "if an appellant raises for review an issue not raised in the pleadings, transcript, or rulings, the appellant must have preserved the issue by raising it in a motion for new trial." *Page*, 64 So. 3d at 489 (¶29) (quoting *Collins v. State*, 594 So. 2d 29, 36 (Miss. 1992)). "The rationale behind this rule is to allow the trial judge the opportunity to consider the alleged error before the issue is on appellate review." *Id*.

¶56. Because Schlegel failed to bring up the *Weathersby* rule as a defense at trial or in his motion for a new trial, he is procedurally barred from raising this issue on appeal. *Id*.

## V.    Sufficiency and Weight of the Evidence

¶57. At trial, Schlegel moved for a directed verdict and argued that the State failed to meet its burden of proving a prima facie case of murder. The trial court denied Schlegel's motion. Schlegel then filed a posttrial motion for judgment notwithstanding the verdict or, alternatively, a new trial, which the trial court also denied.

### A. Sufficiency of the Evidence

¶58.    Schlegel argues that the State failed to present sufficient evidence to convict Schlegel of second-degree murder.

¶59.    When reviewing a ruling on the sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Beasley v. State*, 251 So. 3d 746, 749-50 (¶9) (Miss. Ct. App. 2017) (quoting *Bush v. State*, 895 So. 2d 836, 843 (¶16) (Miss. 2005), *abrogated in part on other grounds by Little v. State*, 233 So. 3d 288 (Miss. 2017)).  This Court will accept as true "[a]ll credible evidence consistent with the defendant's guilt . . . , together with all favorable inferences that may be reasonably drawn from the evidence." *Jackson v. State*, 263 So. 3d 1003, 1016 (¶40) (Miss. Ct. App. 2018), *cert. denied*, 263 So. 3d 665 (Miss. 2019).  We recognize that "[i]f the facts and inferences point in favor of the defendant with sufficient force that reasonable persons could not have found the defendant guilty beyond a reasonable doubt, then the reviewing court must reverse and render." *Hughes v. State*, 90 So. 3d 613, 629 (¶47) (Miss. 2012).  However, "if reasonable persons might reach different conclusions on every element of the offense, then [this Court] will affirm." *Id*.

¶60.    Schlegel maintains that the State's case is purely circumstantial, and therefore the State's burden with respect to the sufficiency of the evidence is heightened.  We recognize that "[t]he State is allowed to prove crimes solely by circumstantial evidence, but such evidence must be 'sufficient to prove the defendant's guilt beyond a reasonable doubt and

to the exclusion of every reasonable hypothesis consistent with innocence.'" *Jackson*, 263 So. 3d at 1016-17 (¶40) (quoting *Fleming v. State*, 604 So. 2d 280, 288 (Miss. 1992)); *see also Dees v. State*, 126 So. 3d 21, 26 (¶19) (Miss. 2013) ("[D]irect evidence is unnecessary to support a conviction when the circumstantial evidence is sufficient to establish guilt beyond a reasonable doubt."). A circumstantial-evidence case requires us to "scrutinize the jury's verdict more closely." *Jackson*, 263 So. 3d at 1017 (¶40). The supreme court has explained that "[c]ircumstantial evidence need not exclude every possible doubt, but should exclude every other reasonable hypothesis consistent with innocence." *Dees*, 126 So. 3d at 26 (¶19). Furthermore, we recognize that "[i]n both direct and circumstantial cases, the jury is empowered to weigh, and resolve conflicts in, the evidence." *Id*.

¶61. Here, the jury convicted Schlegel of second-degree murder, and the court sentenced him accordingly. *See* Miss. Code Ann. §§ 97-3-19(1)(b) & -21(2) (Rev. 2014). Jury Instruction S-3 instructed the jury that if they "find from the evidence in this case beyond a reasonable doubt that . . . [Schlegel] did kill [Henry] . . . while in the commission of an act eminently dangerous to others and evincing a depraved heart, regardless of human life, although without any premeditated design to effect the death of any individual," they must find Schlegel guilty of second-degree murder. *Id.* § 97-3-19(1)(b).

¶62. At trial, the jury heard testimony from Officer Desmond Jones of the Philadelphia Police Department. Officer Jones testified that on July 9, 2015, he received a call about "an older [N]ative American male coming through town drinking in his vehicle." Officer Jones responded to the call and encountered Henry. Officer Jones testified that he arrested Henry for driving with a suspended license and based on a warrant for Henry's failure to pay $2,000

25

in fines, and he transported Henry to the Neshoba County Jail. Officer Jones testified that during his encounter with Henry, he did not observe any physical injuries, nor did Henry complain of any physical injuries. Officer Jones testified that Henry could walk and talk.

¶63. Harvey Hickman, a supervisor at the Neshoba County Jail, testified that on the morning of July 14, 2015, Henry and Schlegel were the only inmates housed in a cell referred to as Detox 2. Hickman testified that Henry had only been housed in Detox 2 since approximately 4:40 p.m. on the previous day (July 13) and that Schlegel was placed in Detox 2 with Henry at approximately 8:30 a.m. on July 14.[9]

¶64. According to Hickman, on July 14 a jailer alerted him to a situation involving Henry. Upon arriving at Detox 2, Hickman testified that he observed Henry lying on the bench, unresponsive and not moving. Hickman also observed Schlegel lying on another concrete slab, appearing to be asleep. Hickman testified that he called medical personnel, who eventually confirmed that Henry was deceased.

¶65. The jury heard testimony from Dr. Mark LeVaughn, the Chief Medical Examiner at the Mississippi State Medical Examiner's Office, who performed an autopsy on Henry. Dr. LeVaughn testified that based on his autopsy examination, Henry died "as a result of a beating from multiple blunt trauma" and that the manner of death was homicide.

¶66. Regarding Henry's injuries, Dr. LeVaughn explained:

[T]here were many areas of his body that were injured, externally and internally, and they were the injuries were all over his body. His head, his

---

[9] Officer Tommy Hunter, a corrections officer at the Neshoba County Jail in July 2015, testified that on July 13, 2015, he moved Henry from Detox 1 to Detox 2 because Henry was irritating the other inmates in Detox 1.

chest, his abdomen, his back, his arms, his legs. There was hemorrhage inside. There were rib fractures on both sides, multiple rib fractures. There was injury to the lungs, injury to the spleen. Those are numerous injuries, and so the term for that is multiple blunt trauma, and in the autopsy report I stated multiple blunt trauma, in common, beating, and it's my opinion, that's how those injuries occurred.

Dr. LeVaughn testified that in his opinion, "death could have occurred in less than an hour after these injuries." Dr. LeVaughn also confirmed that Henry's injuries could not have taken more than five hours to kill him.

¶67. At trial, the State showed Dr. LeVaughn the surveillance video recordings of three jailers pushing Henry on July 13, the day before he died. The first video, from July 13, 2015 at 2:33 a.m., showed Officer Alexander Brown pushing Henry and then Henry falling onto the floor. Officer Brown testified that the day before Henry died, he was alerted by another officer that Henry would not go back into his cell. Officer Brown went to talk to Henry. Officer Brown admitted that he "shoved [Henry] back in the cell so he [wouldn't] come out." After viewing the video of Officer Brown pushing Henry, Dr. LeVaughn testified that this strike alone "absolutely [could] not" have caused all of Henry's injuries.

¶68. The State next showed Dr. LeVaughn the videos of Officer Evelyn McBeath and Officer Barry Truett pushing Henry on July 13, 2015, at approximately 9:00 a.m. and at 9:10 a.m., respectively. Regarding the incident, Officer McBeath testified that on the morning of July 13, she observed that "something was going on in Detox 1," where Henry was being housed at the time, so she opened the cell door. Officer McBeath stated that as she opened the door, Henry came "busting out" of the cell. Officer McBeath explained that she pushed Henry in the chest to "relocate" him back into the cell. Officer Truett also admitted that on

27

the morning of July 13, 2015, he pushed Henry back into his cell. Officer Truett explained that Henry was beating on the door to Detox 1. Officer Truett opened the door and asked Henry to back up, sit down, and stop beating on the door. Officer Truett stated that Henry refused to back up in to the cell, so he pushed him on his chest so that Henry would go back into the cell. Officer Truett testified that Henry then went back into the cell and sat down.

¶69. After viewing the videos, Dr. LeVaughn testified that neither of these pushes would have caused all of Henry's injuries. During redirect examination, the State asked Dr. LeVaughn, "From what you viewed in the videos, could Mr. Henry have received any of the injuries that he had?" Dr. LeVaughn answered, "I did not see him sustain any injuries in the videos."

¶70. The jury also heard testimony from Agent Richardson, who assisted with the investigation of Henry's death. Agent Richardson testified that when she first arrived at the Neshoba County Jail, she was informed of Henry's death and received his medical history, including that he suffered from a heart problem and was going through alcohol withdrawal symptoms.

¶71. Agent Richardson stated that as part of her investigation into Henry's death, she reviewed the video footage from the jail surveillance camera starting from the day Henry entered the jail until the time he was found dead. Agent Richardson testified that after speaking to Dr. LeVaughn and receiving Henry's autopsy report, including information about his specific injuries, she went back through the surveillance video footage to examine any contact Henry had with jailers or other inmates. Agent Richardson then observed "how [Henry] acted and reacted after" his contact with the jailers or inmates. Agent Richardson

28

testified that she also "watched [Henry] walk around and be able to lift his hands up and stand in front of that window for minutes at a time without limping." Officer Richardson stated that "[a]s a reasonable person," she concluded that the only time Henry could have received his injuries was during the time when Schlegel was in Detox 2 with him. Agent Richardson explained, "[T]hat's really when my attention went to [Schlegel]."

¶72. Agent Richardson stated that based on her investigation, she believed that Schlegel beat Henry between 9:20 a.m. to 9:27 a.m. on July 14, after Schlegel met with his probation officer and returned to Detox 2. While reviewing the surveillance video at trial, Agent Richardson identified two quick movements Schlegel made during this time period when she surmised that he was stomping on Henry. Agent Richardson admitted that she could not see inside the jail cell due to the camera angle, but on the video recording, she could "see a movement that makes his head go, bam, bam bam. To me, . . . I feel like he is making some kind of hard movement up and down several times, and he's looking over to the right where Henry is." As stated, jail officers discovered that Henry was deceased at approximately 10:15 a.m. on July 14.

¶73. During Officer Richardson's testimony, the State introduced into evidence the three photographs of Schlegel taken by Officer Richardson on July 17, 2015: two of his right foot and one of his left foot. Officer Richardson testified that the photographs depict bruises on Schlegel's feet, including the bottom of his right foot.

¶74. Keith Jackson, Schlegel's supervising probation officer, testified that he met with Schlegel on the morning of July 14 just before 9:00 a.m. Jackson explained that upon learning that Schlegel had been incarcerated on July 11, he arrived at the jail to talk to

29

Schlegel and perform a drug test on him. Jackson confirmed that he performed a drug test on Schlegel on the morning of July 14 and that the sample tested positive for methamphetamine. Jackson testified that he then informed Schlegel that based on his arrest and failed drug test, he would have to go before the trial judge for a probation-revocation hearing.

¶75. Schlegel testified in his own defense. Schlegel told the jury that shortly after being placed in Detox 2 with Henry, he noticed Henry "on a concrete barrier with his head in between his legs making burbling noises." Schlegel stated that he informed Officer Hutchinson that something was wrong with Henry. Schlegel testified that Officer Hutchinson responded that Henry was "just detoxing." Schlegel testified that he attempted to obtain medical assistance for Henry multiple times. Schlegel testified that he eventually lied down and went to sleep. According to Schlegel, the next time he had any contact with anyone, Officer Hickman and Officer Jamie Hutchinson were in Detox 2 telling Schlegel to get up because Henry was not breathing.

¶76. Schlegel also testified that he sought treatment from Skinner in June 2014 for "plantars feet." Schlegel explained that as a result of plantars feet, his feet are painful, sensitive, bruised, and swollen when he wakes up in the morning. Schlegel testified that he suffered from this condition in 2015. Regarding the three photographs of his feet admitted into evidence, Schlegel testified that he received one of the bruises on the top of his foot after a horse stepped on him four years ago. Schlegel denied stomping on Henry, hitting Henry, or killing Henry. Schlegel also denied telling another inmate that he did not mean to kill Henry or that he killed Henry after he "just lost it" because Henry kept hitting the cell door.

30

¶77.   As to Schlegel's claim that he heard Henry making "burbling noises," no other witness at trial testified that they heard Henry wheezing or making noises.  Officer Cortez Peebles testified that he entered Detox 2 at approximately 3:36 a.m. on July 14, less than seven hours before Henry was found deceased.  Officer Peebles testified that he did not observe any injuries on Henry and did not observe Henry making any wheezing or gurgling noises.

¶78.   After viewing the evidence in the light most favorable to the prosecution, we find that the facts and inferences from the circumstantial evidence could lead a reasonable jury to find that Schlegel was guilty of second-degree murder beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence.  *See Hughes*, 90 So. 3d at 630 (¶51).  As discussed, the jury heard testimony from Dr. LeVaughn that Henry suffered the injuries that caused his death approximately one to five hours before he died.  The jury also heard testimony that Schlegel and Henry were the only two inmates housed in Detox 2 on the morning Henry died.  Dr. LeVaughn reviewed the surveillance video footage showing that three jailers pushed Henry the day before he died.  Dr. LeVaughn testified that none of these pushes could have caused all of Henry's injuries; furthermore, these pushes occurred outside the one-to-five hour time frame provided by Dr. LeVaughn.  Jurors heard testimony from Agent Richardson stating that based on speaking to Dr. LeVaughn and reviewing the surveillance video footage, she concluded that the only time Henry could have received his injuries was during the time when Schlegel was in Detox 2 with him.  This issue lacks merit.

### B.     Weight of the Evidence

¶79.   Schlegel also asserts that the trial court erred when it failed to grant Schlegel's motion for a new trial on the grounds that the verdict was against the overwhelming weight of the

evidence. Schlegel cites to the factual arguments outlined in his brief regarding the sufficiency of the evidence and he maintains that "[t]here is no direct evidence as to who killed Rexdale Henry." Schlegel asserts, however, that the evidence presented at trial shows that Henry was assaulted by three jailers. Schlegel also points to the missing three hours of video footage from the morning of July 14 and submits that because of the missing footage, no one knows if anyone else went into Henry's cell or if Henry tried seeking attention during that time.

¶80. A defendant may challenge the weight of the evidence in a motion for a new trial. *Woods v. State*, 242 So. 3d 47, 59 (¶51) (Miss. 2018). The reviewing court must "weigh the evidence in the light most favorable to the verdict" and "only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Little v. State*, 233 So. 3d 288, 292 (¶21) (Miss. 2017).

¶81. Based on the same evidence and testimony addressed above, we reject Schlegel's argument that the trial court erred when it denied his motion for a new trial. Although the transcript reflects that Schlegel testified that he did not stomp on Henry or kill him, and that he tried seeking medical assistance for Henry, we recognize that "[t]he jury is charged with the responsibility of weighing and considering conflicting evidence, evaluating the credibility of witnesses, and determining whose testimony should be believed." *Wallace v. State*, 139 So. 3d 75, 78 (¶8) (Miss. Ct. App. 2013). Furthermore, "[f]actual disputes are properly resolved by a jury and do not mandate a new trial." *Ealey v. State*, 158 So. 3d 283, 293 (¶31) (Miss. 2015). Taking the evidence that supports the jury's verdict as true and reviewing it in the light most favorable to the verdict, we find that allowing the verdict to stand would not

sanction an "unconscionable injustice." *Little*, 233 So. 3d at 292 (¶21).

## VI. Harmless Error and Cumulative Error

¶82. Schlegel maintains that the above errors cannot be considered harmless. Schlegel argues that the multiple violations of his fundamental right to a fair trial might have contributed to his conviction and possibly influenced the jury. Schlegel further asserts that the cumulative effect of the errors at trial mandates reversal of his conviction.

¶83. "The cumulative error doctrine stems from the doctrine of harmless error, which holds that individual errors, which are not reversible in themselves, may combine with other errors to make up reversible error, where the cumulative effect of all errors deprives the defendant of a fundamentally fair trial." *Lyons v. State*, 237 So. 3d 763, 774 (¶46) (Miss. Ct. App. 2017). "However, reversal based upon cumulative error requires a finding or findings of error." *Id*. Furthermore, "prejudicial rulings or events that do not even rise to the level of harmless error will not be aggregated to find reversible error." *Mouton v. State*, 227 So. 3d 1079, 1086 (¶28) (Miss. 2017). The supreme court has held that "one potential harmless error does not amount to cumulative error." *Id*.

¶84. Because this Court finds no error in any of Schlegel's issues on appeal, the cumulative-error doctrine does not apply. *See Morrow v. State*, 275 So. 3d 77, 85 (¶31) (Miss. 2019) ("Because no cumulative harmless errors require reversal, the cumulative error doctrine is inapplicable."). This issue is without merit.

¶85. Based on the foregoing analysis, we affirm Schlegel's conviction and sentence.

¶86. **AFFIRMED.**

**BARNES, C.J., GREENLEE, WESTBROOKS, TINDELL, McDONALD,**

33

**LAWRENCE AND C. WILSON, JJ., CONCUR. McCARTY, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION, JOINED BY WESTBROOKS AND McDONALD, JJ.; TINDELL, J., JOINS IN PART. J. WILSON, P.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**

## McCARTY, J., SPECIALLY CONCURRING:

¶87. I join the Court's opinion in full because it is based on Mississippi Supreme Court precedent and faithfully applies it. Yet there is a jarring disconnect between the high standard required to receive a spoliation instruction in a criminal case, which requires an intentional act, and the low one in a civil case, which automatically raises a presumption of spoliation without the need to prove bad faith or intent. We should not impose a higher standard in a criminal case, when a person's liberty is at stake.

¶88. Starting in 2001, the Supreme Court explained that in a civil case "[w]hen evidence is lost or destroyed by one party (the 'spoliator'), thus hindering the other party's ability to prove his case, a presumption is raised that the missing evidence would have been unfavorable to the party responsible for its loss." *Thomas v. Isle of Capri Casino*, 781 So. 2d 125, 133 (¶37) (Miss. 2001). Importantly, the civil litigant is not required to show any bad faith or intentional or fraudulent act by the spoliator to receive the instruction. *Id*. at (¶40). For "[r]equiring an innocent litigant to prove fraudulent intent on the part of the spoliator would result in placing too onerous a burden on the aggrieved party." *Id*.

¶89. There was an important reason the high standard would be harmful. "To hold otherwise would encourage parties with weak cases to 'inadvertently' lose particularly damning evidence and then manufacture 'innocent' explanations for the loss." *Id*. If requiring a party to prove bad faith was required, "the spoliator could essentially destroy

34

evidence and then require the innocent party to prove fraudulent intent before the destruction of the evidence could be used against it." *Id*.

¶90. Because that standard was too high a burden to prove and would lead to unfair results, the Supreme Court allowed a lower standard to receive a spoliation instruction. *Id*. at 134 (¶43). When given, the instruction does not automatically require a jury to find in favor of the innocent party. In a recent decision, the Supreme Court reiterated the decision in *Thomas* and made clear that "the jury is not *required* to draw an adverse inference that the evidence would have been unfavorable, but the innocent party is entitled to an instruction *permitting* the jury to draw a negative inference from spoliated evidence." *Renner v. Retzer Res. Inc.*, 236 So. 3d 810, 816 (¶23) (Miss. 2017) (emphasis in original). Even simply "where evidence is unavailable due to negligence, an inference arises that the evidence would have been unfavorable, and the jury should be so instructed." *Id*.

¶91. Here, instruction D-16 would have fit snugly into the mold set by *Thomas* and *Renner* since it would have told the jury that from the loss of the tape "you may infer, though you are not compelled to do so, that if the video recordings were produced in court it would be damaging to the State's case," and "[y]ou may give this inference such force and effect as you think it should have under all of the facts and circumstances." This would not require the jury to find that whatever was on the tape was positive but would allow them to do so.

¶92. Yet the instruction was bound to be declined, for as the Court points out above, the standard is much higher in criminal cases—where "a defendant is not entitled to a spoliation instruction absent evidence that the State destroyed the evidence with an intent to suppress the truth." *Roberson v. State*, 199 So. 3d 660, 666 (¶25) (Miss. 2016). So while in a civil

case a permissive spoliation instruction is given even if a defendant negligently loses or destroys a tape, in a criminal case a defendant has to prove it was destroyed "with an intent to suppress the truth" in order to gain the instruction.

¶93.    This is simply an impossible burden to bear—and one in civil cases the Court has held is "too onerous a burden," because the party in the possession of the evidence "could essentially destroy evidence and then require the innocent party to prove fraudulent intent before the destruction of the evidence could be used against it." *Thomas*, 781 So. 2d at 133 (¶40).

¶94.    If true in civil cases, where damages and property are at stake, this must also be true in a criminal case, where liberty is at stake. Not only does that make logical sense, but it fits within our precedent on jury instructions in criminal cases. For "in homicide cases, the trial court should instruct the jury about a defendant's theories of defense, justification, or excuses that are supported by the evidence, *no matter how meager or unlikely*, and the trial court's failure to do so is error requiring reversal of a judgment of conviction." *Clayton v. State*, 106 So. 3d 802, 806 (¶10) (Miss. 2012).

¶95.    There is no evidence in this case that the footage was consciously destroyed, and as the Court indicates, no proof that it was destroyed with intent to suppress the truth. Yet the spoliation instruction would have been given in a comparable civil case, even though there was just money on the line and not liberty. The rule in civil cases is thoughtful and based on precedent and common sense. It does not require a negative inference but leaves the jury free to weigh the facts and evidence. The same rule should be applied in criminal cases.

**WESTBROOKS AND McDONALD, JJ., JOIN THIS OPINION. TINDELL, J.,**

**JOINS THIS OPINION IN PART.**