# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-KA-00772-COA

**TERRANCE LONGINO A/K/A TERRANCE CHARLES LONGINO A/K/A TERRANCE LONGINO, JR.**                    APPELLANT

v.

**STATE OF MISSISSIPPI**                    APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 03/28/2024 |
| TRIAL JUDGE: | HON. ELEANOR JOHNSON PETERSON |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: HUNTER NOLAN AIKENS |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: DANIELLE LOVE BURKS |
| DISTRICT ATTORNEY: | JODY EDWARD OWENS II |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 11/18/2025 |
| MOTION FOR REHEARING FILED: | |

**BEFORE BARNES, C.J., EMFINGER AND WEDDLE, JJ.**

**EMFINGER, J., FOR THE COURT:**

¶1.     Terrance Longino was found guilty of first-degree murder pursuant to Mississippi Code Annotated section 97-3-19 (Supp. 2017), in the Circuit Court of Hinds County, Mississippi, on March 28, 2024. He was sentenced to serve a term of life imprisonment in the custody of the Mississippi Department of Corrections (MDOC). Longino appeals his conviction.

## FACTS AND PROCEDURAL HISTORY

¶2.     On the morning of Saturday, July 7, 2018, Lee Eric Evans Jr. left his house to walk

to the neighborhood store. During his half-mile walk, he was shot nine times and left for dead in the street. Lee Evans Sr. testified the last time he saw his son alive was that morning, just before he was killed. According to Evans Sr., he and his son had spoken briefly before his son left to go to the store. Evans Sr. went outside to get in his truck and heard four or five gunshots ring out, followed by a slight hesitation and then four or five more. Evans Sr. got into his truck and drove down the street toward the sound of the shots because that was the same direction his son would have been walking. Evans Sr. found his son lying in the street and got out to help his son.

¶3.    Charmaine Smith testified that she was driving down the street, at about 10 to 15 miles per hour, when she saw "a young man running and he just fell all of a sudden." She wondered why he had fallen, and a few seconds later she saw another young man come out of the alleyway, stand over the man and "emptied on him." She said this man had his gun out and shot the man lying in the road. According to Smith, the shooter then turned around and went back up the alleyway. Smith testified that the shooter was a "young black male wearing an orange hat, orange shirt, and blue shorts." Smith called 911 and stayed at the scene to render whatever assistance she could to the victim. Days after the shooting, law enforcement showed Smith a photo lineup and she identified Longino as the shooter. At trial, Smith also identified Longino as the person she saw shoot Evans.

¶4.    Nufteria Harris testified that as she approached what turned out to be the scene of the shooting, she saw "a young fellow with orange on running" to the right of the direction she was driving. While Harris could not identify the defendant as the person she saw running

2

from the scene, she was certain that the person running was wearing orange. She further testified that she then looked to her left and saw a person lying on the ground. She stopped at that point to call 911 and discovered that an ambulance was already on the way.

¶5.     The Jackson Fire Department (JFD) medical response team was the first responder to arrive. While they were attempting to provide medical assistance to Evans, Patrol Officer Leca Coleman from the Jackson Police Department (JPD) arrived on the scene. When she was advised that Evans had died, she secured the crime scene and contacted her superiors. Coleman then began talking to potential witnesses. Sergeant Corry Jenkins, a JPD robbery-homicide detective, was next to arrive. Coleman advised Jenkins that the deceased's father was present, along with a possible eyewitness. Jenkins spoke with Evans Sr., who advised him that his son, Evans Jr., had been in an argument with someone who lived nearby on Robinson Street. Jenkins then spoke with Smith about the young man she had seen fleeing the area.

¶6.     Stephanie Horn, a JPD crime scene investigator, was called to process the crime scene. Horn began by taking photographs of the area. Horn recovered nine shell casings and one live round, which she photographed, packaged, and sent to the crime lab. These exhibits were admitted into evidence at trial.

¶7.     As a result of his interview with the victim's father, Jenkins continued his investigation by going to a residence on Robinson Street. At the residence, Jenkins met Longino's father, and he asked Longino Sr. to come speak with him at JPD headquarters. Longino's father told Jenkins that his son had admitted to him that he had shot someone.

3

¶8.     With this information, Jenkins proceeded to Smith's home and presented her with a six-man non-suggestive photo lineup. Smith identified Longino as the person she saw shoot Evans. As a result of Smith's identification of Longino as Evans' killer and Longino Sr.'s statement that his son had admitted to shooting someone, Longino was arrested on July 11, 2018, by the Jackson Police Department. After his arrest, Longino gave a recorded statement to the police. The white Dodge Neon that Longino Sr. said his son had been driving on the day of Evans' murder was also impounded and processed.

¶9.     Longino was indicted for deliberate design murder under section 97-3-19(1)(a) by a grand jury in Hinds County, Mississippi, on May 2, 2019.[1] Longino's trial commenced on March 25, 2024. After opening statements for both sides, the State called its first witness, Officer Coleman, who testified about what she encountered upon arrival on the scene and how she handled her investigation. The next witness called by the State was Investigator Tate. During his testimony, a map of the crime scene was admitted into evidence. Tate identified an alleyway, a convenience store, and Longino's house based upon a report describing where the incident occurred. The State's next witness was Investigator Horn. Photographs that Horn took at the scene were admitted into evidence. Horn also identified the nine spent shell casings she recovered, which were believed to have been fired from a nine-millimeter handgun. Horn walked the jury through the steps of processing the impounded Dodge Neon. She testified that they found an extended nine-millimeter magazine

---

[1] Longino was originally indicted for first-degree murder by an indictment filed on July 25, 2018, in Hinds County Circuit Court (Case No. 1:18-cr-00457-EFP). This cause was remanded by an order entered on March 25, 2024, after the State filed a superseding indictment.

under the spare tire in the trunk of the car, photographed it, and then bagged it as evidence. These photographs were also admitted into evidence along with the physical magazine cartridge. Harris, Smith, and Evans Sr. were the State's next three witnesses and testified as set out above. Jackson Police Department 911 Communications Manager Shequita Townsend testified that she had the responsibility of pulling the recording of Smith's 911 call and putting it on a disc. The disc was entered into evidence, and the recording was played for the jury. Jenkins testified about his interviews of the witnesses as discussed above. During his investigation, he told the jury that the defendant's father and Smith identified Longino as Evans' killer. Jenkins then testified that he prepared a warrant and had the Dodge Neon impounded. On cross-examination, Jenkins testified that no weapon was recovered and that no orange shirt or blue shorts were found.

¶10.    The State then called Longino Sr. to testify, and he positively identified his son as the defendant sitting in the courtroom. Early into the State's questioning, Longino Sr. gave elusive answers and avoided other answers. He did, however, recount doing yard work with his son on the morning of the shooting and later saw him go inside to change clothes. He said he watched his son leave the house and run through the alleyway across the street from their house. Longino Sr. testified that the next time he saw his son was "standing up in the front[,] close around by [his] daughter's window." Longino Sr.'s demeanor toward the State became "negative," and he made statements inconsistent with what he had told police; so the State requested permission to treat him as a hostile witness. The court granted the request. Longino Sr. said that his son left home driving a Dodge Neon that his mother had allowed him to use.

¶11.    On cross-examination, the defense asked Longino Sr., "[Y]ou said that your son made a statement that he shot the boy that broke into the house?" Longino Sr. answered, "He came to me and told me that he shot the boy that he caught in the house last night." When Longino Sr. began to go into further detail, the court sustained the State's objection based on a prior ruling regarding Longino's mental health history.

¶12.    Following Longino Sr.'s testimony, the State's final two witnesses were Dr. Mark LeVaughn, the forensic pathologist for the State medical examiner's office, and Melissa Dewberry, a firearms examiner with the Mississippi Forensics Laboratory. LeVaughn's autopsy photographs were admitted into evidence, and he described each of the nine bullet wounds. In his professional opinion, he concluded that Evans' death was caused by multiple gunshot wounds and that the manner of death was homicide. Dewberry testified as to her examination of the shell casings and projectiles in this case. The results of her analysis classified each item tested as "bear[ing] class characteristics consistent with nine-millimeter caliber."

¶13.    Once the State rested, the defense made a motion for a directed verdict. Based upon the evidence put forth by the State, the court denied the motion. The court advised Longino of his right to testify, and contrary to his attorney's recommendation, Longino decided to take the stand. During direct examination, Longino testified that he had been helping his father on the morning of the shooting. Longino then left and went to his grandmother's house. He claimed he had "never went down no alleyway a day in [his] life" and "never shot a gun." On cross-examination, Longino continued to deny having shot a gun and denied that he was

6

wearing orange the day Evans was killed. As will be discussed below, even after reviewing a portion of his recorded statement to police, he denied that he was wearing orange that day.

¶14. When Longino was questioned about telling his father that he shot a guy, he responded, "I lie to my daddy all the time." He further testified that his father was scared and "don't know what's going on." Longino also denied driving a Dodge Neon but then admitted that he drove it sometimes. When asked if he drove the vehicle to his grandmother's house on the morning of the incident, he responded, "No, I didn't drive it. Somebody else had took me there." Longino was unable to recall the name of his friend who took him there but stated they had grown up together. After being shown the map from the scene, Longino recognized the alleyway as being near his house but, again, denied ever walking through it.

¶15. During redirect examination, Longino denied knowing Evans. He testified he had never communicated with Evans. Longino stated, "I wasn't the one that pulled the trigger. I told him I never shot a gun a day in my life. I never owned a gun." The defense rested without calling any additional witnesses.

¶16. Following an overnight recess, the trial concluded on March 28, 2024, when the jury returned a unanimous verdict of guilty of first-degree murder. Longino was sentenced to serve a term of life imprisonment in the custody of MDOC. Longino filed a "Motion for Judgement Not Withstanding the Verdict or in the Alternative Motion for New Trial," which was denied. Aggrieved by the verdict, Longino appealed.

**STANDARD OF REVIEW**

¶17. Both issues raised by Longino on appeal concern the exclusion of testimony and

7

evidence at trial. Concerning our standard of review on such matters, this Court stated in

*Galarza v. State*, 385 So. 3d 862, 867 (¶¶12-13) (Miss. Ct. App. 2024):

> We review "the trial court's decision to admit or exclude evidence under an abuse of discretion standard of review." *Smith v. State*, 986 So. 2d 290, 295 (¶12) (Miss. 2008) (citing *Jones v. State*, 962 So. 2d 1263, 1268 (¶21) (Miss. 2007)). "Abuse of discretion is an appellate court's most deferential standard of review." *Owens v. State*, [383 So. 3d 305, 309] (¶19) (Miss. Mar. 28, 2024).
>
> "As long as the trial court remains within the confines of the Mississippi Rules of Evidence, its decision to admit or exclude evidence will be accorded a high degree of deference." *Lomas v. State*, 328 So. 3d 670, 688 (¶49) (Miss. Ct. App. 2021) (quoting *Magee v. State*, 300 So. 3d 1088, 1090 (¶9) (Miss. Ct. App. 2020)). "Reversal is appropriate only when the circuit court's abuse of discretion results in prejudice to the accused." *Id.* (quoting *Williams v. State*, 308 So. 3d 892, 894-95 (¶8) (Miss. Ct. App. 2020)).

We will address both issues raised by Longino separately below.

## ANALYSIS

**I.     Did the trial court abuse its discretion by denying Longino's request to require the State to publish to the jury his entire pre-trial statement to police during the State's cross-examination of Longino at trial?**

¶18.    The indictment charged that Longino killed Evans on July 7, 2018. Several days

before the trial of this matter, on March 20, 2024, the State filed a motion in limine asking

the trial court to prohibit Longino from mentioning anything about a statement he gave to law

enforcement on July 11, 2018, concerning Evans' death unless or until the State first uses or

introduces the statement into evidence. On the morning of trial, before voir dire began, there

was a conference concerning any pretrial matters that needed to be addressed. During this

conference, Longino's trial counsel brought up the State's motion in limine regarding the

defendant's statement to law enforcement. He told the court that he had seen a docket entry

8

that indicated the motion had been granted. At that time, defense counsel stated, "I just want to make sure that applies to both sides. If it's hearsay for the defense to do it, it's hearsay for the State to do it as well." After some discussion, the trial court reserved ruling on the State's motion until the matter was raised during trial.

¶19. Although the State did not bring up Longino's statement to law enforcement during its case-in-chief, as noted above, two witnesses for the State testified that the shooter wore an orange shirt. Longino testified in his own defense, and on cross-examination, Longino denied several times that he wore an orange shirt on the day Evans was killed. After these denials, the State asked Longino if he remembered giving a statement to law enforcement, and Longino indicated that he did. The State specifically asked if, during his police interview, he told the officers that he was wearing an orange shirt that day. Longino denied telling the police that he had been wearing an orange shirt.

¶20. Outside the jury's audible range, the State approached the bench and asked the court for permission to play for the defendant and the jury, a short portion of the interview "for purposes of impeachment where he directly says[,] 'I was wearing an orange shirt on that morning[,]' for the limited purpose of impeachment." The defense objected and asked that the State be required to publish the entire police interview. The trial court overruled the objection and ruled that the State did not have to play the entire interview because only a portion was being utilized exclusively for impeachment purposes.

¶21. We note that during this brief bench conference, Longino's trial counsel did not point the trial court to Mississippi Rules of Evidence 106, which provides:

> If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part--or any other writing or recorded statement--that in fairness ought to be considered at the same time.

Further, trial counsel did not point the trial court to any portion of the recorded statement "that in fairness ought to be considered at the same time."

¶22. After the court's ruling, the State asked the predicate questions once again, and after receiving the same answers from Longino, an audio clip was published in open court. Longino admitted that the voice was him speaking in the clip that was played. The following exchange then occurred:

> Q. And you did, in fact tell officers that on that morning you were wearing an orange shirt?
> A. I don't – I don't even remember wearing an orange shirt. I wasn't wearing an orange shirt.
> Q. But you told police officers that at that time six years ago?
> A. But I wasn't wearing an orange shirt.

On redirect examination, Longino's trial counsel did not bring up the recorded statement and made no additional argument as to why he should be allowed to publish the entire interview.

¶23. The audio clip that was played was not admitted into evidence, and Longino's trial counsel failed to proffer Longino's statement to law enforcement for the record on appeal. Longino's new appellate counsel raises Rule 106 and the "rule of completeness," which the supreme court addressed in *Jackson v. State*, 245 So. 3d 433, 443 (¶¶58-59) (Miss. 2018):

> This rule now is subsumed by Mississippi Rule of Evidence 106. Often referred to as the rule of completeness, it provides that, when a party introduces all or part of a writing, recorded statement, or audio recording, "the adverse party may require introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time." *See* M.R.E. 106. "Under Mississippi case law the rule of

10

completeness is extended . . . even to oral statements." M.R.E. 106 cmt. (citing *Sanders* [*v. State*], 237 Miss. 772, 115 So. 2d 145 [(1959)]).

> Here, Jackson **failed to invoke this rule or make any argument for it to the trial court. That should have been done, along with requesting a proffer of the audio recording on that basis. Because that was not done, this Court has no way of knowing what is contained in the audio recording. And the matter cannot be considered on direct appeal**. *Green*, 89 So. 3d at 554.

(Emphasis added). Similarly, in the case at hand, because Longino failed to make a proffer of the excluded evidence, his claim is procedurally barred.

**II.      Did the trial court err in prohibiting Longino's father from testifying concerning Longino's mental health history in support of an insanity defense?**

¶24.    Longino's defense filed a motion for a competency evaluation, treatment, and *M'Naghten*[2] analysis, pursuant to Mississippi Code Annotated section 99-13-11 (Rev. 2020) and Rule 12 of the Mississippi Rules of Criminal Procedure.  A hearing on Longino's competency to stand trial was held on the morning of March 27, 2023, the day his trial was set to begin. During this hearing, Longino's attorney offered into evidence, without objection, the report from Longino's mental evaluation, authored by Dr. Reb McMichael and Dr. Amanda L. Gugliano. In this report, McMichael and Gugliano gave their opinion that Longino was competent to stand trial and that he was not "insane" under *M'Naghten* at the time of the offense.

¶25.    The defense then called Longino Sr. as a witness. Longino Sr. testified that his son went to Hinds Behavioral Health, "and they diagnosed him with something." He further testified that Longino was given "some kind of medicine to take, but [Longino Sr.] didn't

---

[2] *M'Naghten's Case*, 8 Eng. Rep. 718 (1843).

know what it was." Longino Sr. stated that he was not able to afford the medicine, so his son was not able to continue taking it. As Longino got older, he began telling his father that he believed the Freemasons and Department of Human Services were watching them. Longino also believed that the Freemasons had burned their vehicles.

¶26. After considering the mental evaluation report and Longino Sr.'s testimony, the court found Longino competent to stand trial. The court then recessed for lunch and anticipated beginning voir dire after the lunch break. Upon returning from lunch, the State advised the court that it had filed a "Motion In Limine Regarding Defense Attempts to Back Door Insanity Defense." In this motion and in argument, the State opposed any testimony concerning Longino's sanity. Pursuant to the new Mississippi Rules of Criminal Procedure, the State had not seen the report of the mental evaluation performed on Longino until it was entered into evidence during the morning session. The State argued that it had not had time to determine if the authors of the report were available to testify. The court determined that even though the defense had given a notice of alibi, the defense had not given the State or the circuit clerk written notice of Longino's intent to raise insanity as a defense. *See* MRCrP 17.4(b). As a result of a lack of notice to the State, the trial court ruled that the defense of insanity could not be raised at trial. Longino's father would be allowed to testify as to what he observed on the day of the murder and how his son was behaving but could not go back into Longino's mental health history. The court further ruled that if the defendant testified, he could say whatever he wanted to say.

¶27. At that point the trial began with voir dire and the selection of the jury. After the jury

12

was selected, seated, and sworn, the court recessed for the night, with the trial set to continue the following morning. However, the next day, March 28, 2023, a mistrial was declared when the trial judge had a family emergency arise.

¶28. A year later, on March 25, 2024, Longino's trial began again. Longino's trial counsel announced that the defense would proceed with its alibi defense. The trial court reminded counsel that he would not be allowed to introduce evidence in support of an insanity defense. The trial proceeded without any further mention of insanity.

¶29. On appeal, new appellate counsel contends that Longino's father should have been allowed to give testimony that tended to support an insanity defense. Notably, Longino acknowledges on appeal that his trial counsel did not file a formal notice of intent to offer an insanity defense under Mississippi Rule of Criminal Procedure 17.4(b). After the trial court's ruling on lack of notice in March 2023, Longino had a full year to file a notice of an insanity defense but, apparently, chose not to do so. Instead, as noted above, Longino elected to proceed on an alibi defense. Nevertheless, Longino argues that in criminal cases, procedural and evidentiary rules do not trump his fundamental right to present a complete defense.

¶30. Mississippi Rule of Criminal Procedure 17.4(b) states in part:

> If a defendant intends to rely upon the defense of insanity at the time of the alleged crime, the defendant shall, within the time provided for filing pretrial motions or at such later time as the court may direct, serve upon the prosecuting attorney and the clerk of the court a written notice of the intention to offer a defense of insanity.
>
> Within ten (10) days thereafter, but in no event less than ten (10) days before the trial, unless the court otherwise directs, the defendant shall serve upon the

prosecuting attorney the names and addresses of the witnesses upon whom the defendant intends to rely to establish the defense of insanity.

. . . .

If there is a failure to comply with the requirements of subsection (b)(1), the court may use such sanctions as it deems proper, including:

. . . .

(D) Excluding the testimony of appropriate witnesses.

¶31. It is clear that Mississippi Rule of Criminal Procedure 17.4(b) provides a trial judge the authority to impose sanctions for a party's failure to comply with the notice requirement regarding a proposed insanity defense. More specifically, the judge has the authority to exclude the testimony based on non-compliance with the rules. In *Mitchell v. State*, 403 So. 3d 110, 118 (¶32) (Miss. Ct. App. 2025), this Court stated:

> "The standard applied for appellate review of a trial court's sanction for discovery abuses is 'whether the trial court abused its discretion in its decision.'" *Lipsey v. State*, 50 So. 3d 341, 346 (¶12) (Miss. Ct. App. 2010) (quoting *Gray v. State*, 799 So. 2d 53, 60 (¶26) (Miss. 2001)). In exercising its discretion, the trial court "must also insure the constitutional right of the accused to present a full defense in his or her case." *Ross v. State*, 954 So. 2d 968, 996 (¶56) (Miss. 2007). But an accused's "right to present relevant testimony is not without limitation. The right may, in appropriate cases, bow to accommodate other legitimate interests in the criminal justice process." *Coleman v. State*, 749 So. 2d 1003, 1008 (¶11) (Miss. 1999).

(Emphasis omitted). In *Mitchell*, this Court explained that in *Coleman*, in concluding that "the trial court's ruling excluding the defendant's alibi witness was 'entirely consistent' with both the notice-of-alibi rule and the defendant's rights under the federal and state constitutions, the supreme court began its analysis by observing that '[o]ne of the fundamental policies of our criminal procedural rules is the avoidance of unfair surprise to

14

either the prosecution or the defense.'" *Id*. at 119 (¶35) (quoting *Coleman*, 749 So. 2d at 1008 (¶13)).

¶32. In the case at hand, Longino's father was not precluded from testifying at trial altogether; rather, his testimony was limited. Longino Sr. was allowed to testify regarding his observations of Longino's demeanor and state of mind on the day of the murder. Testimony regarding Longino's mental health history and treatment was not allowed. Because Longino failed to comply with the notice requirement in Mississippi Rule of Criminal Procedure 17.4(b), we find that the trial court did not abuse its discretion in excluding evidence of insanity.

## CONCLUSION

¶33. After review of the record, we find no error by the trial court in excluding Longino's complete interview with law enforcement or in prohibiting Longino's father from testifying regarding the history of Longino's mental health and treatment. Therefore, Longino's conviction and sentence for first-degree murder are affirmed.

¶34. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., McDONALD, LAWRENCE, McCARTY, WEDDLE AND LASSITTER ST. PÉ, JJ., CONCUR. WESTBROOKS, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**